506 F.Supp. 23 (1980)
GREATER ST. LOUIS HEALTH SYSTEMS AGENCY et al., Plaintiffs,
v.
Joseph P. TEASDALE et al., Defendants.
No. 79-1213 C (3)
United States District Court, E. D. Missouri, E. D.
March 11, 1980.
June 30, 1980.
*24 *25 *26 *27 Charles A. Newman, St. Louis, Mo., for plaintiffs.
Michael Boicourt and Larry Marshall, Asst. Attys. Gen., Jefferson City, Mo., Thomas W. Wehrle and Daniel Bartlett, Jr., Asst. County Counsel, Clayton, Mo., Jack Louis Koehr and Michael E. Hughes, St. Louis, Mo., for defendants.
On Attorneys' Fees Issue June 30, 1980.

MEMORANDUM
FILIPPINE, District Judge.
At issue in this action is the validity of numerous provisions of the Missouri Certificate of Need Law ("CON"), which was signed into law by the Governor of Missouri on August 6, 1979. CON represents Missouri's effort to implement the certificate-of-need program of the National Health Planning and Resources Development Act of 1974 ("the Act"), 42 U.S.C. § 300k et seq.[1] Plaintiffs challenge the validity of provisions of CON on a variety of grounds, both federal and state. Plaintiffs' request for a temporary restraining order against the enforcement of CON was denied by this Court, and a one-day trial on the merits of plaintiffs' allegations was held.
The federal Act established an ambitious and comprehensive program for national health care planning and authorized the allocation of funds to assist the state and local agencies which were to have primary responsibility for planning and coordinating health care services and facilities. See 42 U.S.C. § 300k(b). It is critical to note for purposes of this action that the Act did not constitute a mandatory regulation; it merely established an optional program which a state must implement if that state wishes to take advantage of the federal funds allocated by the Act. N. Carolina v. Califano, 445 F.Supp. 532 (E.D.N.C.1977), aff'd, 435 U.S. 962, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978); Goodin v. State ex rel. Okl. Welfare Com'n., 436 F.Supp. 583 (W.D.Okla. 1977).
The Act directed the Secretary of the Department of Health, Education and Welfare ("the Secretary") to establish the boundaries of health service areas after consideration of the recommendations of the Governors of the states. A health systems agency ("HSA") was then to be designated within each such area. The health service areas established were to meet certain *28 geographic and demographic criteria specified in the Act, 42 U.S.C. § 300l(a). Any revision of the boundaries of the health service areas established by the Secretary may be made only with the approval of the Secretary. 42 U.S.C. § 300l(b)(4). Each HSA is to have a governing body which meets certain requirements of composition. 42 U.S.C. § 300l-1(b)(3).
The Act requires a participating state to have a designated health planning and development agency ("State Agency") whose duties are, inter alia, to "[c]onduct the health planning activities of the State" and to "administer a state certificate of need program which applies to the obligation of capital expenditures within the State and the offering within the State of new institutional health services and the acquisition of major medical equipment". 42 U.S.C. §§ 300m, 300m-2 (as amended). The State Agency is to be advised by a Statewide Health Coordinating Council ("SHCC"), whose functions include the preparation of a State health plan and the review of the health systems plans ("HSPs") and annual implementation plans ("AIPs") devised by each HSA in the state, 42 U.S.C. § 300m-3 (as amended).
While a state is not necessarily required by the Act to enact any legislation to qualify for participation in the program, see S.Rep.No. 96-96, 96th Cong., 1st Sess., 43, reprinted in 1979 U.S.Code Cong. & Ad. News, p. 1306, at p. 1348, it is necessary that the State Agency have the authority under state law to administer a satisfactory certificate-of-need program. The essence of the certificate-of-need program is the requirement that any proposed construction of or significant capital expenditure for health facilities in a state be certified to be necessary by the State Agency before it is offered. The program is intended to reduce unnecessary duplication in health care facilities and thereby, it is hoped, reduce the cost of health care to consumers.
One of the features of the Act with direct relevance to the issues of this lawsuit is the independence of the designation and functions of the HSAs from those of the State Agencies. An HSA is designated directly by the Secretary, although the Governors of the States are to be consulted before a conditional designation is made, 42 U.S.C. § 300l-4, and the State Agencies are to be consulted before an HSA's designation is renewed, 42 U.S.C. § 300l-4(c) (as amended). Similarly, the State Agencies are designated directly by the Secretary, although the HSAs within the State are to be consulted before a State Agency's designation may be renewed. 42 U.S.C. § 300m(b)(4)(A) (as amended). The funding by the federal government of the HSAs is independent of the funding of the State Agencies. See §§ 300l-2(c)(3); 300l-5; 300m-4. However, as the parties have stipulated, if a satisfactory CON program is not in effect in a state by a certain date, the ultimate penalties involve reduction in the funding of the state's HSAs as well as of the State Agency. § 300m(d) (as amended).
The subject of this lawsuit is the certificate-of-need law enacted by the State of Missouri. CON established a Missouri Health Facilities Review Committee ("MHFRC"), to be composed of members of the Missouri Senate and House and appointees of the Governor. The MHFRC was given the responsibility of administering the CON program in the State of Missouri. CON also contains provisions relating to the selection of members of the governing boards of the HSAs and to the use by the HSAs of public funds for lobbying activities with the Missouri General Assembly.
The parties have entered into the following stipulations:
Plaintiff, Greater St. Louis Health Systems Agency ("GSLHSA") is a Missouri not-for-profit corporation, duly incorporated and presently in good standing with its registered office located at 915 Olive Street, St. Louis, Missouri 63101. Pursuant to the Act, 42 U.S.C. § 300l-4, the GSLHSA has been designated by the Secretary of Health, Education and Welfare (the "Secretary") as the HSA for the designated bi-state health service area comprising the City of St. Louis, the Missouri counties of St. Charles, Franklin, Jefferson, and St. Louis, and the *29 Illinois counties of Madison, St. Clair, Clinton and Monroe.
Plaintiff, Jo Ann Sheffield, resides at 352 S. Sixth, Mascoutah, Illinois, and is a "consumer" of health care services as that term is defined in the Act, and is a member of the General Assembly of the GSLHSA.
Plaintiff, Joseph H. Heimann, resides at R.R. # 1, Germantown, Illinois, within Clinton County, is a "consumer" of health care services as that term is defined in the Act, and is a member of the General Assembly of the GSLHSA.
Defendant Teasdale is Governor of the State of Missouri and defendant Ashcroft is Attorney General of the State of Missouri. Defendants John Doe and Jane Roe are hypothetical appointees to the MHFRC. No individuals have, as yet, been appointed to serve on the MHFRC.[2]
There are approximately 2,379,800 residents within the GSLHSA's health service area. Approximately 578,500 are residents of the State of Illinois and 30,800 are residents of Clinton County, Illinois. Area residents over eighteen years of age may become members of the General Assembly of the GSLHSA, the agency's membership body, by completing an application. There are 2,853 members of the General Assembly; 2,227 are residents of Missouri, 626 are residents of Illinois. There are presently 51 people on the Board of Directors of the GSLHSA; 25 are residents of Missouri and 26 are residents of Illinois, and 4 are residents of Clinton County, Illinois.
The GSLHSA has served as the exclusive HSA in the designated bi-state health service area embracing the St. Louis metropolitan region since 1976. Further, on an annual basis, the GSLHSA's designation by the Secretary has been renewed.
The Secretary has designated five health service areas to serve citizens within the State of Missouri.
The designated health service area for the St. Louis metropolitan region encompasses portions of both Missouri and Illinois. This bi-state health service area encompasses the entire St. Louis Standard Metropolitan Statistical Area.
The Governors of Missouri and Illinois, have signed agreements with the Secretary specifically allowing the GSLHSA to function as a HSA in the designated bi-state health service area.
The GSLHSA annually receives from the Department of Health, Education and Welfare funds in excess of $10,000.00. For the fiscal year ending March 31, 1979, the GSLHSA received grant funds from HEW totalling $1,173,019.00. The utilization of these funds is subject to continuous review by the Secretary.
The designation of the GSLHSA as the exclusive HSA within the specified bi-state health service area has been reviewed by the Secretary.
The GSLHSA has established, annually reviews, and revises as appropriate the HSP and AIP for its bi-state health service area.
In Missouri, the State Health Planning Development Agency of the Missouri Department of Social Services (referred to herein as a State Health Planning and Development Agency, i. e. "SHPDA") has been established and designated to serve as the designated "State Agency".[3]
Neither defendant Teasdale nor any preceding Governor of Missouri has made a request that the duties of the SHPDA be performed by another agency of the State government or obtained the Secretary's agreement to permit any entity other than the Missouri SHPDA to perform the required functions. [The parties disagree as to the necessity for such a request.]
The Secretary has not granted an exception from the procedures, criteria and standards, and sanctions specified in the Act which are applicable to the Missouri SHPDA and its certificate of need program.
*30 The GSLHSA, since its designation as an HSA, has been and presently assists the Missouri SHPDA in the performance of capital expenditure reviews and makes recommendations regarding the need for new institutional health services.
The relationship between the GSLHSA and the Missouri SHPDA with regard to these functions has, on occasion, been reduced to formal writings and/or memoranda.
Illinois also has enacted a certificate of need law, the Illinois Health Facilities Planning, S.H.A. ch. 111½ § 1152 et seq.
The GSLHSA, since its designation as a HSA for the bi-state health service area including the Illinois counties of Madison, St. Clair, Clinton, and Monroe, has been and presently assists the Illinois SHPDA in the performance of capital expenditure reviews and makes recommendations regarding the need for new institutional health services in the Illinois portion of its health service area.
The relationship between the GSLHSA and the Illinois SHPDA with regard to these functions has, on occasion, been reduced to formal writings and/or memoranda.
The GSLHSA has entered into various contracts and memoranda of understanding with divisions of the States of Illinois and Missouri other than the respective SHPDAs, and with, both in Missouri and Illinois, not-for-profit corporations and other entities which perform health planning and/or health facility review functions. Under these contracts and memoranda, the GSLHSA renders services necessary to, provides data regarding, and performs other duties relating to, regional health planning.
The by-laws of the GSLHSA require that its General Assembly meet annually in October for the purpose, inter alia, of electing members to the Board of Directors.
The Board of Directors of the GSLHSA established October 10, 1979 as the date for the 1979 annual meeting.
The GSLHSA General Assembly met on that date and elected eight Missouri and eight Illinois residents and members of the General Assembly to the Board of Directors.
Claiming authority under CON, Gene McNary, Executive of St. Louis County, and Charles Klamon, President of the St. Louis County Municipal League, jointly appointed two individuals to the GSLHSA's Board of Directors by letter dated October 8, 1979. These appointments were made by McNary and Klamon without meeting or consulting with the Mayor of the City of St. Louis, any of the mayors of municipalities within St. Louis County, or county court judges of St. Charles County, Franklin County, Jefferson County and the Illinois Counties of Madison, St. Clair, Clinton and Monroe.
Claiming authority under CON, James Conway, Mayor of the City of St. Louis, appointed four persons to the GSLHSA's Board of Directors by separate letters dated October 9, 1979. These appointments were made by Conway without meeting or consulting with the Executive of St. Louis County, any of the mayors of municipalities within St. Louis County, or county court judges of St. Charles County, Franklin County, Jefferson County and the Illinois Counties of Madison, St. Clair, Clinton and Monroe.
Claiming authority under CON, Ralph Krodinger, Presiding Judge of the County Court of Jefferson County (Missouri), appointed two individuals to the GSLHSA's Board of Directors by letter dated October 11, 1979. These appointments were made by Krodinger without meeting or consulting with the Mayor of the City of St. Louis, the Executive of St. Louis County, any of the mayors of municipalities within St. Louis County, or county court judges of St. Charles County, Franklin County and the Illinois Counties of Madison, St. Clair, Clinton and Monroe.
The present CON Law fails to comply fully with the requirements of applicable federal law and regulations. The Department of Health, Education and Welfare has so informed the State of Missouri. The *31 Missouri State Health Planning and Development Agency of the Department of Social Services ("SHPDA") is in the process of preparing new certificate of need legislation and intends to submit it to the next session of the Missouri General Assembly. The SHPDA is relying partially upon federal recommendations in drafting this legislation.
Among the harms which plaintiffs claim to suffer as a result of the existence and enforcement of CON are the following: preclusion of the designation of plaintiff GSLHSA as the HSA serving the St. Louis area after December 31, 1981; interference with the scope of plaintiff GSLHSA's functions as prescribed by the Act; interference with the individual plaintiffs' right under federal law to participate in the selection of members of plaintiff GSLHSA's governing body; and deprivation of plaintiffs' due process rights by the vagueness of the section of CON which prohibits HSAs from using public funds for lobbying with the Missouri General Assembly.

JURISDICTION
At the outset, it is necessary to address the issue of this Court's jurisdiction over this action. Plaintiffs have alleged jurisdiction pursuant to 28 U.S.C. §§ 1331(a) and 1337(a). Defendants have not expressly controverted the jurisdictional allegation, although the defendant County has, without discussion, denied all allegations of the paragraph in which plaintiffs lay claim to jurisdiction in this Court.
A requisite to federal jurisdiction under § 1331(a) is that "the matter in controversy" exceed "the sum or value of $10,000, exclusive of interest and costs". Plaintiffs do not seek damages in this action. Their prayer is that this Court enter a declaratory judgment that certain provisions of CON, and the appointments made to GSLHSA's Board of Directors pursuant to CON, are void. Plaintiffs also pray for an injunction restraining defendants from enforcing CON.
"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In Hunt, the Supreme Court measured the "value of the object of the litigation" by the diminished profits and the substantial costs of compliance that the North Carolina statute at issue caused to be incurred by the plaintiffs, who were apple growers from the State of Washington. Similarly, in McNutt v. General Motors &c. Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 781, 80 L.Ed. 1135 (1936), the amount in controversy in the plaintiff corporation's challenge to an Indiana regulatory statute was said to be the value of "the right to be free of that regulation. The value of that right may be measured by the loss, if any, which would follow the enforcement of the rules prescribed. The particular allegations of respondent's bill as to the extent or value of its business throw no light upon that subject."
Of more relevance to the instant case is KVOS, Inc. v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936), in which the plaintiff, Associated Press, a membership corporation which supplied news items to its member newspapers, sued a radio station which allegedly pirated the news supplied to certain members. The Associated Press received $8,000 monthly from the newspapers affected by the defendant's actions, but the Supreme Court held that this was insufficient to satisfy the amount in controversy requirement (then $3,000). In view of the fact that the plaintiff "[made] no profit from furnishing news to its members but equitably divide[d] the expense amongst them," 299 U.S. at 278, 57 S.Ct. at 201, the Court held that the Associated Press did not stand to lose the $8,000 in question.
In the instant case, plaintiffs apparently consider that the amount in controversy requirement of § 1331(a) is satisfied by the fact that plaintiff GSLHSA receives grants well in excess of $10,000 from the federal government yearly. However, under the holding of KVOS, Inc., supra, the size of *32 plaintiff's annual budget is not the measure of the value of the object of this litigation. Plaintiffs have alleged that one provision of CON, § 2(6), precludes GSLHSA's continued designation as an HSA. One object of this litigation may thus be viewed as GSLHSA's continued eligibility for designation as the HSA serving the St. Louis area. However, to hold that GSLHSA's right to control federal grants is to be valued by the size of those grants is to disregard plaintiff's nonprofit status and to ignore KVOS, Inc., supra. In an analogous situation involving federal Headstart funds, a concurring opinion in a Second Circuit case noted:
The object NCEOC [the plaintiff] here sought to gain was the right to spend an annual grant of $1,096,400, rather than one of $1,019,650. Since the grant was required to be disbursed for public purposes, it is hard to see what economic loss NCEOC can suffer from the reduction ... Insofar as the alleged injury to NCEOC consists of a loss of prestige or political power not susceptible of monetary valuation, such items may not be taken into account in determining the qualification for jurisdictional amount.
Economic Op. Com'n of Nassau Cty., Inc. v. Weinberger, 524 F.2d 393, 408 (2d Cir. 1975) (Friendly, J., concurring in the dismissal of the plaintiff's complaint; the Court's opinion based federal jurisdiction on 28 U.S.C. § 1361 because various officials of the Department of Health, Education and Welfare were named as defendants in the suit.)
As to the individual plaintiffs in this action, they claim that the provisions of CON exclude them from participation in the federal health planning program in various ways. Accepting these allegations as true, the Court does not perceive that either individual plaintiff has $10,000 at stake in the controversy. It is highly tenuous even to pose the argument that, for example, if Clinton County, Illinois, is excluded from consideration in certificate of need applications by Missouri or Illinois health care facilities, the individual plaintiffs might, as a result, have $10,000 additional medical expenses at some point in the future.
Nor can the plaintiffs satisfy the $10,000 requirement with the sums of federal funding which Missouri stands to lose if it does not have a satisfactory CON law by October, 1980. This Court cannot enact a satisfactory law for the State. The result of this litigation cannot possibly be to assure that Missouri or the plaintiffs will continue to receive federal funds. Plaintiffs are not, by way of contrast, suing the Department of Health, Education and Welfare to prevent a cut-off of federal funding because of HEW's dissatisfaction with CON.
For the above reasons, the Court concludes that the amount in controversy requirement of § 1331(a) has not been satisfied, and that jurisdiction is not proper pursuant to that section.
Turning to § 1337(a), the Court notes again that the Act is not a mandatory regulation; nor is the Act an exercise of Congressional power under the Commerce clause, but it is rather an exercise of the spending power. North Carolina v. Califano, supra; Goodin v. State ex Rel. Okl. Welfare Com'n, supra. The Act is therefore not an act "regulating commerce or protecting trade and commerce" within the meaning of § 1337(a), and jurisdiction is not properly founded on that section. Mid-America Regional Council v. Mathews, 416 F.Supp. 896, 901 (W.D.Mo.1976).
Plaintiffs have made numerous allegations involving the United States Constitution in this action. They claim, for example, that many provisions of CON conflict with the Act or regulations promulgated thereunder, and are therefore void under the Supremacy Clause. Plaintiffs also claim that the provision relating to lobbying with public funds is unconstitutionally vague and that it deprives plaintiffs of First Amendment rights. The Court, hence, may find jurisdiction in this action over certain of plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1343(3), if those claims are of a substantial character. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).
*33 However, the Supreme Court recently held, squarely, that federal jurisdiction may not be premised solely on a Supremacy Clause issue. In Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), the plaintiffs in two separate cases had challenged state welfare regulations as inconsistent with federal law. The Third Circuit had dismissed the case on appeal for lack of jurisdiction; the Fifth Circuit had ordered a reversal on the merits of its case. The Supreme Court held: (1) that the phrase "any right, privilege, or immunity secured by the Constitution of the United States", as it appears in § 1343(3), does not embrace claims resting solely on the Supremacy Clause; (2) that 42 U.S.C. § 1983 does not provide any substantive rights, but merely gives a remedy, and hence does not constitute an "Act of Congress providing for equal rights" within the meaning of § 1343(3) nor an "Act of Congress providing for the protection of civil rights" within the meaning of § 1343(4); and (3), that the Social Security Act is not a statute securing "equal rights" or "civil rights" within the meaning of § 1343(3) and (4). The Supreme Court thus upheld the Third Circuit's dismissal for want of jurisdiction, and reversed the Fifth Circuit's holding that federal jurisdiction was proper pursuant to § 1343(4).
Because this Court finds that the plaintiffs have stated a substantial due process argument against the constitutionality of the section of CON relating to the use of public funds for lobbying, this Court does have subject matter jurisdiction to the extent of that claim, pursuant to § 1343(3). This Court has thus been confronted with the question whether it should exercise its discretion to entertain the pendent federal and state law claims. The pendent claims, if retained, must be decided first to avoid needless decisions of federal constitutional law. Hagans v. Lavine, supra.
In United Mine Workers v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), in which the pendent claim arose only from state law, the Supreme Court set out the considerations which govern the exercise of a federal court's discretion to accept pendent claims:
It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants ... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. * * * The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation ... Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited ... [R]ecognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case.
In Hagans v. Lavine, supra, the pendent claim was a Supremacy Clause challenge to New York AFDC regulations. Federal jurisdiction rested on the plaintiffs' Equal Protection Clause claim. The district court held the regulations invalid on the Supremacy Clause ground, and the Court of Appeals reversed on the ground that federal jurisdiction was lacking due to the insubstantiality of the Equal Protection claim. The Supreme Court reversed, holding that the plaintiffs had presented a substantial equal protection issue. The Court then indicated that there were particularly strong reasons for the exercise of jurisdiction over the pendent federal claims in the circumstances of the case.
[T]he rationale of Gibbs centers upon considerations of comity and the desirability of having a reliable and final determination of the state claim by state courts having more familiarity with the controlling principles and the authority to render a final judgment. These considerations *34 favoring state adjudication are wholly irrelevant where the pendent claim is federal but is itself beyond the jurisdiction of the District Court for failure to satisfy the amount in controversy. 415 U.S. at 548, 94 S.Ct. at 1385.
The Court went on to state that where the pendent federal claims involve Supremacy Clause issues, the argument for pendent jurisdiction is particularly strong.
In accordance with the above principles, this Court has determined to retain, subject to the discussions on standing and ripeness, infra, jurisdiction over the pendent federal claims only. The pendent state claims involve sensitive issues of Missouri constitutional law, and it would surely promote justice between the parties to require adjudication of those claims in the state courts more familiar with the issues presented. Moreover, an adjudication of the pendent state claims will not require the detailed familiarity with the provisions of the federal Act which is required for adjudication of all the federal claims, so the duplication of judicial effort will be minimal. Because the great bulk of plaintiffs' claims in this action are pendent claims, the Court does not find it unfair to require an adjudication of the state claims in state court.

PENDENT FEDERAL CLAIMS
Plaintiffs' amended complaint contains two basic varieties of pendent federal claims. They are: 1) that certain provisions of CON "are in irreconcilable conflict with the Act and/or regulations promulgated thereunder and are void under U.S. Const. Art. VI, the supremacy clause"; and 2) that certain provisions of CON "impermissibly interfere with interstate commerce in violation of Art. 1, Sec. 8 of the United States Constitution". Paragraphs 36 and 38. The challenged sections and subsections under the first claim are §§ 2(5), 2(6), 2(8), 2(12), 4.11, 4.14, 7, 7.2, 11, 13, and 14.3. Under the second claim plaintiffs challenge only §§ 2(6), 2(8), 7.1(2), 11, and 14.3.
Although the defendants have not challenged the plaintiffs' standing to raise any of the above claims, standing is an aspect of a federal case which is constitutionally required by the "cases or controversies" concept of Article III of the United States Constitution. Linda R.S. v. Richard D., 410 U.S. 614, 616, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). It is essential to a plaintiff's standing, initially, where no statute expressly confers standing by creating legal rights, that the plaintiff "allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction". Id. at 617, 93 S.Ct. at 1148. The injury alleged need not be economic, Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), but it must be "specific and perceptible". United States v. SCRAP, 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). In another formulation of the injury in fact requirement, the Supreme Court has said "[w]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). See L. Tribe, American Constitutional Law, at 80-97 (1978).
This Court has determined that the plaintiffs lack standing to assert many of their Supremacy Clause claims. The Court has made this determination because it is clear that CON does not purport to prescribe procedures for HSAs to follow in the independent CON reviews which the HSAs are required to make under the Act. CON establishes criteria and procedures for the MHFRC alone. Section 7.1(4) strengthens this interpretation of CON. It provides that the MHFRC shall consider the recommendations of the HSAs, "provided such recommendations are documented and based on published criteria, plans and standards adopted by the health systems agency". The reference to published criteria and standards of the HSAs would be illogical *35 were CON itself to be interpreted as supplying the criteria for the HSAs.
Thus, many of the alleged disparities between CON and the certificate-of-need program envisioned in the Act affect only the scope of the State's program; they do not limit the scope of GSLHSA's independent assessment of need. Plaintiff GSLHSA has failed to demonstrate any injury to itself as a result of those alleged conflicts which occur in sections which merely prescribe the conditions for the program to be administered by the MHFRC, and this Court declines to launch upon a gratuitous journey as a roving commission on the consistency of CON with the Act.
Plaintiffs may argue, of course, that sufficient inconsistencies will cause the Secretary to reduce allocations to plaintiff GSLHSA pursuant to 42 U.S.C. § 300m(d). However, as the Court noted above, if plaintiffs are successful in their efforts to have CON invalidated, the declaratory and injunctive relief they will be afforded cannot possibly have the effect of redressing that harm. This Court's invalidation of a defective law does not ensure that the Missouri General Assembly will pass a law that is satisfactory to the Secretary.
As to the individual plaintiffs, it is clear that the disparities alleged in certain provisions of CON do not affect their rights under the Act as residents of the St. Louis health systems area. For example, the notice of the commencement of a CON review by the State Agency, which they, as "affected persons", are required to receive under 42 C.F.R. § 123.407(a)(1) (1979), is provided for by CON §§ 2(8) and 7.1(2).[4] Their right as "persons directly affected" to request a public hearing in the course of the State Agency's review under 42 C.F.R. § 123.407(a)(7)(i) (1979) is provided for by CON §§ 2(8) and 7.1(3). Therefore, the plaintiffs' rights under the Act as "affected persons" and "directly affected persons" are protected by CON, and plaintiffs have no standing to complain that the rights of other parties are not protected.
While the individual plaintiffs might conceivably argue that if the program administered by the State is more limited in scope than that required by the Act, health planning in the St. Louis area will be less effective and therefore health care costs may be higher in the future, this Court would reject such an allegation as entirely too speculative. Cf. Eastern Ky. Welfare Rights Org., supra, (indigent plaintiffs, who sought to challenge a new IRS policy which required of hospitals less free medical care than was formerly required to confer tax benefits on the hospitals, lacked standing because the connection between the denial of free medical services to plaintiffs and the IRS policy was too speculative.)
Accordingly, the Court has concluded that plaintiffs lack standing to challenge the following sections of CON: §§ 2(5), 2(8), 2(12), 4.11, 4.14, 7.1(2), 7.2, and 13. They also lack standing to assert the following challenges to § 7: (1) that the section does not provide to certain agencies the opportunity to request a public hearing, because, as the Court has already indicated, plaintiffs' right to request a hearing is preserved by CON, and (2), that the section does not require the submission to the MHFRC of letters of intent in the case of construction projects, because the GSLHSA is free to require the submission of such letters of intent to the GSLHSA pursuant to 42 C.F.R. § 122.410(l)(10) (1979) and 42 U.S.C. § 300n-1. The Act, and the regulations promulgated pursuant thereto, clearly envision separate sets of procedural requirements for the HSAs and the State Agencies. See 42 U.S.C. § 300n-1; 42 C.F.R. §§ 122, Subpart D and 123, Subpart E (1979).
The standing requirement is not an empty technicality. It ensures that issues will be litigated by parties with a vital interest in the outcome of the litigation. The plaintiffs were clearly most interested by those three provisions of CON, discussed below, which affected them. Their evidence on most of the other provisions consisted primarily *36 in pointing out that the words of CON are not verbatim the words of the Act. Had the plaintiffs been injured by the other provisions, and hence had they standing to challenge those provisions, they would certainly have been more motivated to give the issues relating to these provisions a more thorough airing. The wisdom of the standing requirement is thus well illustrated by the course of this litigation.
Nor does the Court believe that its holding as to plaintiffs' standing will leave the State of Missouri free to establish any sort of phony ritual in place of an effective certificate-of-need program. The Department of HEW holds the pursestrings. Missouri's CON law obviously has to satisfy the Secretary. However, the fact that the Secretary must be satisfied does not mean that the plaintiffs must be satisfied, when the plaintiffs have suffered no injury.
In addition, the Court has determined that the remainder of plaintiffs' challenges to § 7 are not ripe. Ripeness, in the sense of the certainty of an injury, is an aspect of a claim as fully mandated by the "case or controversy" limitation of Article III of the United States Constitution as is standing. Longshoremen's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954). Plaintiffs' remaining challenges to § 7 involve alleged omissions of various procedures or details mandated by the Act. However, although the section of CON establishing the MHFRC was effective upon the signing of the law, the provisions requiring a certificate of need from the MHFRC, and the provisions of § 7 relating to the committee's procedures, will not be effective until October 1, 1980. CON § A. The MHFRC is empowered by §§ 3.6 and 5 of CON to promulgate reasonable rules and regulations "governing the submission, review and disposition of applications," and "to meet the objectives of this act", respectively. Nothing in CON would prohibit the MHFRC from rectifying some or all of the errors of omission alleged by plaintiffs before the date when the review provisions of CON are applicable. Hence, plaintiffs' claims in this area are simply not ripe for hearing, because "the injury is [not] certainly impending". Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923).
Plaintiffs' claim of conflict between the Act and §§ 2(6), 11 and 14.3 of CON, however, is a different matter because those sections do not relate solely to the program administered by the MHFRC; instead, they affect in varying degrees the activities of all HSAs in the state, and the effects are either fully presently felt, in the case of §§ 11 and 14.3, or are so clearly mandated by CON that the MHFRC could not by regulation alter the effect, in the case of § 2(6). "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Regional Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Hence, plaintiff GSLHSA, at least, has standing to assert those claims. The Court now turns to the merits of those claims.
Subsection 2(6) has been the object of much attention in this action. The subsection defines the phrase "health systems agency" as "a regional health planning agency established pursuant to PL 93-641 and, after December 31, 1981, in accordance with Section 1512[300l-1](b)(1)(B) thereof." The provision of the Act to which reference is made in the definition is that which prescribes that an HSA may be a public regional planning body. All parties to this lawsuit have interpreted § 2(6) to require that after December 31, 1981, there shall be no HSAs in the State of Missouri except HSAs which are public regional planning bodies.
The Court disagrees with this interpretation of § 2(6). The subsection is merely a definition. In itself it does not require or preclude anything. No legal consequences flow from a definition standing alone. If there were a provision in CON which read "Hereafter no HSA shall be designated in the State of Missouri except an HSA which satisfies the definition set forth in § 2(6)," *37 then the Court would agree that § 2(6) would have the restrictive effect alleged. However, none of the eleven points at which the phrase "health systems agency (or agencies)" appears in CON outside of § 2(6) is such a provision.
For example, as it appears in § 7.1(4), the definition contained in § 2.6 means that the MHFRC is required by CON to consider the recommendations concerning certificates of need made by the HSAs, but after December 31, 1981, only by those HSAs which are regional planning bodies. While this provision might indeed by inconsistent with the Act, it does not affect GSLHSA's ability to perform its functions or its eligibility for designation as an HSA by the Secretary.
Accordingly, this Court does not interpret CON as precluding the continued designation of plaintiff GSLHSA as the HSA serving the St. Louis area. The Court emphasizes that it therefore intimates no view on whether the State of Missouri could, in fact, require all HSAs in the state to be public regional planning bodies. The Court does not reach that issue because the issue has not been presented, on this Court's interpretation of CON.
However, the fact that § 2(6) does not preclude GSLHSA's designation does not mean that the definition works no mischief. In fact, it could lead to the very unhappy situation in which all the HSAs in the State of Missouri were non-profit corporations, but the MHFRC did not communicate with or recognize those HSAs because they did not fit the definition of a "health systems agency" prescribed by CON. One example should make this clear. Under 42 C.F.R. § 123.407(a)(9) (1979), an HSA, after receiving notification of a State Agency's certificate-of-need decision which is inconsistent with the recommendation of the HSA, may request that the State Agency's decision be reviewed by another agency of the State, in accordance with state law. CON § 8 provides this right of appeal to "the applicant or the health systems agency." After December 31, 1981, plaintiff GSLHSA would no longer be a "health systems agency" as defined in CON, and hence, would have no right to appeal an inconsistent decision of the MHFRC. Similarly, plaintiff GSLHSA would not be entitled, after 1981, to receive a copy of the written decision of the MHFRC pursuant to CON § 7.1(6), because it would not be a "health systems agency".
After consideration of the above consequences of the definition appearing in § 2(6), the Court has concluded that the definition must fall. The HSAs obviously have a much closer appreciation of the health care needs of an area than does a State Agency. The requirement of the regulation cited above, that an HSA be allowed the right to appeal a State Agency's decision which conflicts with the HSA's recommendation, is a reasonable one, and one that helps to insure that certificates of need will be granted or denied only after full weight has been given to the views of the local agencies, which are presumably most familiar with the needs of their areas. Accordingly, § 2(6) must be declared invalid for its inconsistency with federal law.
As to § 11, plaintiffs claim that it is more restrictive of their right to lobby than is the Act, 42 U.S.C. § 300l-2(a) (as amended), and hence that it must fall. CON § 11 provides that it shall be a misdemeanor for a "member of a or employee of a health system agency" to "use any state, federal or local funds for lobbying activities with the Missouri General Assembly." The Act, however, permits federal funds to be used to influence the passage or defeat of federal, state or local legislation if those funds are used to compensate an HSA employee whose primary responsibility is not lobbying. The House Conference Report on the 1979 Amendments indicates that the provision "was adopted to prohibit an HSA from hiring or contracting with an individual to lobby. The conferees, however, recognize that HSA staff and board members have a right to represent their agency's views before both executive and legislative branches. This amendment is not intended to in any way to [sic] alter that right." House Conf.Rep.No.96-420, 96th Cong., 1st sess., 67, reprinted in 1979 U.S.Code Cong. & Ad. News, p. 1422, at p. 1435.
*38 However, the question before the Court on plaintiffs' claim of conflict between § 11 and the Act involves not so much a consideration of plaintiff GSLHSA's rights as of its duties. The functions of an HSA as enumerated in the Act, § 300l-2(b-h) (as amended) are the following: the assembly and analysis of data; the establishment and review of an HSP and an AIP for the area; the implementation of the HSP and the AIP, in part through the award of grants with federal funds; the coordination of its activities with those of certain other entities; the review of proposed uses within the area of certain federal monies; the recommendation to State Agencies concerning certificates of need for new institutional health services; the periodic review of health services offered in the area; and the collection of information on rates charged in the area for hospital services. In none of the above does the Court find a necessity for an HSA to engage in lobbying, as that term is generally understood. There is no apparent need for an HSA to attempt to influence the passage or defeat of legislation in order fully to satisfy the requirements of the Act. The expertise which an HSA gains in the health care planning for its area is fully utilized by its preparation of the HSPs, its almost binding recommendations to the Secretary concerning uses of federal funds, and its certificate-of-need recommendations to the State Agency. The Court cannot see how the prohibition of § 11, while broader than that of the Act, thwarts the federal scheme in any way. Accordingly, plaintiffs' claim that § 11 must be declared invalid because it conflicts with federal law will be rejected.
Turning to § 14.3, CON provides in part that "[t]he selection of members of the board to fill any vacancies occurring prior to December 31, 1981 for each Health Systems Agency shall be made within each sub area by a caucus of the county court judges or their counterparts and the mayors of that sub area". The Act, on the other hand, provides that
Each health systems agency shall establish a process for the selection of the members of its governing body which process is designed to assure that ... (ii) there is the opportunity for broad participation in such process by the residents of the health service area of the agency, and (iii) the participation of such residents will be encouraged and facilitated. Such process shall prohibit the selection of more than one-half of the members of such body by members of such body.
42 U.S.C. § 300l-1(b)(3)(D), added by § 109 of the 1979 Amendments. The Conference Committee report indicates that this provision was added to the Act because of the conferees' concern that HSAs, "which are supposed to be open and accessible can become closed with a self-perpetuating board providing policy direction unsupported by the general public. The conferees view such a prospect with concern and have thus adopted this provision which will prohibit self-perpetuation." House Conf.Rep.No.96-420, 96th Cong., 1st Session, 66, reprinted in [1979] U.S.Code Cong. & Ad.News, pp. 1422, 1433.
Although the amendment to the Act was designed to prevent the evil of self-perpetuation, and this purpose would not necessarily be thwarted by the appointment of Board members by a caucus of elected officials such as county court judges and mayors, the Court is compelled to find that § 14.3 does not provide the "opportunity for broad participation in [the selection] process by the residents of the health service area of the agency" which is required by the Act. Putting aside the problems that arise from the fact that the St. Louis health service area encompasses Illinois, the Court finds that § 14.3 would fall if the section affected Missouri residents alone. It is true that § 14.3 does not preclude some degree of participation by area residents in the selection process; for instance, area residents might transmit their views on Board candidates to the county court judges and mayors. The Act does not actually require that area residents' votes be the determining factor. However, CON fails even to assure that area residents' views will be given any consideration at the caucuses.
*39 Furthermore, the term "sub area" is not defined in CON and it is not clear whether all Illinois residents are to be considered part of a "sub area" for which only Missouri officials select Board members. If this is the situation contemplated in § 14.3, the participation rights of Illinois area residents would be curtailed even more than those of Missouri area residents.
In making its determination that § 14.3 must fall, the Court has taken due notice of the view expressed in a letter sent by Mr. Colin C. Rorrie, Jr., Director of the Bureau of Health Planning and Resources Development of HEW, to the Executive Director of the Mid-America Health Systems Agency, in Kansas City, Missouri.[5] Mr. Rorrie's letter sets out the views of the Department's Bureau of Health Planning, reached after consultation with the Department's Office of the General Counsel, on sections 2(6)[6] and 14.3 of CON. Mr. Rorrie's letter states that these provisions of CON "are not immediately and irreconcilably in conflict with" the Act as amended in 1979. The primary concern expressed in the letter is that the transition to the new procedures be an orderly one. The letter notes, however, that the new selection process "will have to satisfy [42 U.S.C. § 300l -1(b)(3)], as amended, which requires broad participation by the residents of the health service area in the selection of the governing body." The letter concludes by saying "we are committed to helping facilitate a cooperative effort within the State for the implementation of Section 14.3 and are willing to provide whatever assistance is necessary to ensure an orderly transition."
The Supreme Court has indicated that the construction of a statute by those charged with its enforcement should be followed by the courts absent "compelling indications that it is wrong". N. Y. Dept. of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973). In Dublino, the Department of HEW's continued approval of the state work regulations at issue was considered relevant by the Court to its decision whether the state regulations had been pre-empted by provisions of the Social Security Act.
However, this Court observes that the view of Mr. Rorrie is neither a published regulation or ruling of HEW nor a long-standing policy that has been applied by HEW to a number of states' CON programs. The "official positions" to which the Courts are required to give deference have usually been of one or the other variety. See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Miller v. Youakim, supra. In view of the fact that the amendment at issue is of such recent vintage that the Department of HEW has had scarcely more experience in administering the amended Act than this Court has had experience in interpreting it, the Court does not feel constrained to defer to the view of § 14.3 expressed in Mr. Rorrie's letter.
Moreover, Mr. Rorrie himself noted a possible problem in reconciling § 14.3 with the "broad participation" requirement of the Act. The Court takes his statement that § 14.3 is not "immediately and irreconcilably in conflict with" the Act as a decidedly *40 qualified endorsement of the selection process established in § 14.3. In effect, Mr. Rorrie's view is similar to that expressed by this Court above: CON does not necessarily preclude some limited participation by area residents, but CON does not assure or encourage it, either.
After consideration of the matter, the Court holds that § 14.3 of CON conflicts impermissibly with the Act as amended.
Plaintiffs have advanced an additional claim in the nature of a Supremacy Clause claim, that subsections 2(6) and (12) of CON respectively preclude any existing entity from serving as the HSA for the St. Louis Area and constitute an impermissible revision of boundaries. The Court has already ruled that § 2(6) is invalid, and plaintiffs have no more standing to assert their claim in this guise against § 2(12) than they had above. The Court holds the same with regard to plaintiffs' argument that § 2(12) violates the Contract Clause of the United States Constitution. The Court can discern no effect or injury of any variety in § 2(12), and is at a total loss to understand plaintiffs' allegations concerning the section.
Under their second set of pendent federal claims, plaintiffs challenge §§ 2(6), 2(8), 7.1(2), 11, and 14.3 as impermissible interferences with interstate commerce. The Court has already held § 2(6) is invalid and that plaintiffs have no standing to challenge §§ 2(8) and 7.1(2).
As to § 11, plaintiffs contend that CON "operates to prohibit use of ... Illinois funds to lobby the Missouri General Assembly with respect to regional health issues affecting both Missouri and Illinois residents, consumers and providers," and that the section is therefore an impermissible burden on interstate commerce. Memorandum of Plaintiffs in Support of Complaint for Declaratory Judgment and Injunction at 22.
Even if the interstate donation of funds is commerce within the meaning of Art. I, Sec. 8, Cl. 3 of the United States Constitution, the Court observes that nothing in § 11 prohibits or restricts continued interstate donation. The prohibition has a totally intrastate effect. Moreover, the State of Illinois remains free under § 11 to: 1) use the $15,000 which it has contributed annually to plaintiff GSLHSA to conduct its own lobbying campaign before the Missouri legislature on health care issues in the St. Louis area; 2) donate the $15,000 to other Missouri or Illinois non-profit groups which could lobby before the Missouri legislature; or 3) hire private individuals to lobby before the Missouri legislature. Nothing in § 11 would appear to prohibit plaintiff GSLHSA or the individual plaintiffs from contacting the Illinois legislature or any such group or individual to inform them of the plaintiffs' views on health care issues in the St. Louis area.
Accordingly, the Court finds that § 11 does not represent an undue burden on interstate commerce.
Plaintiffs' remaining commerce clause argument relates to § 14.3. The Court has already invalidated this section on other grounds and has no occasion to consider the commerce clause argument.

CONSTITUTIONAL CLAIMS
Plaintiffs challenge §§ 2(6), 2(12), 11, and 14.3 of CON as violative of their right to due process of law. The Court will not repeat its rulings as to §§ 2(6), 2(12), and 14.3.
As to § 11, plaintiffs claim that, as a criminal provision, it lacks sufficient certainty and definiteness. Plaintiffs also claim that it denies them their statutory right to represent their views before the Missouri General Assembly. Amended Complaint para. 37(C).
The well-known standard applicable to claims of vagueness was enunciated by the Supreme Court in United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954):
The Constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. *41 The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.
The Court rejects plaintiffs' contention that the phrase "any state, federal or local funds" is vague. That phrase obviously encompasses public funds, and public funds alone.
However, the Court is of the opinion that the phrase "lobbying activities with the Missouri General Assembly" is not sufficiently definite to give members and employees of plaintiff GSLHSA fair notice of the conduct proscribed. The evidence adduced at trial shows that members and employees of GSLHSA have had wide and varied contact with members of the Missouri Legislature. For example, plaintiff GSLHSA's Executive Director received an invitation from the Chairman of the Missouri Senate's Standing Committee on Public Health, Welfare, Environment and Consumer Protection to testify regarding certificate-of-need legislation. On another occasion, several members of the State legislature were present at one of the meetings of GSLHSA's General Assembly at which certificate-of-need legislation was discussed. There were letters sent by plaintiff GSLHSA to members of the legislature on nursing home legislation as well. There is a Legislative Committee within the GSLHSA, and the Committee is composed of volunteer Agency members who are assisted by staff members.
Under § 11, would it be a misdemeanor for a volunteer member of the Legislative Committee to use a postage stamp bought with federal funds to send his views on health legislation to a member of the legislature? Or does "lobbying activities" mean physical presence of a member or employee within the halls of the Missouri State Capitol? Would it be a misdemeanor for the Executive Director to accept reimbursement from GSLHSA for his travel expenses if he went to Jefferson City to testify at the invitation of a Senate Committee? Would plaintiff GSLHSA be required to exclude members of the Missouri Legislature from their General Assembly meetings if the hall rental had been paid with state or federal funds? The Court finds that the answers to these questions are not clear, and that members and employees of GSLHSA must guess what the answers might be. There is no reasonable construction that this Court can devise to provide certainty to the term "lobbying activities with the Missouri General Assembly". The term "lobbying" has an indefinite scope, and "lobbying activities" is yet more unclear.
Accordingly, § 11 must be declared invalid for its failure to give the plaintiffs fair notice of the conduct proscribed, as required by the due process clause of the Fourteenth Amendment to the United States Constitution. The Court thus has no occasion to consider plaintiffs' First Amendment argument with regard to § 11.
In sum, plaintiffs' request for injunctive and declaratory relief will be granted as to §§ 2(6), 11, and 14.3. It follows from the Court's invalidation of § 14.3 that the appointments purportedly made pursuant thereto are also invalid, and the Court so declares.
Finally, with regard to plaintiffs' request for attorneys' fees, the Court notes that since this action was brought, in substance if not in form, to enforce a provision of 42 U.S.C. § 1983, plaintiffs may be entitled to attorneys' fees under 42 U.S.C. § 1988. The Court will allow 15 days for the submission of appropriate affidavits and briefs from the plaintiffs on their request for attorneys' fees, and will allow 15 additional days for a response by the defendants. In the meanwhile, there being no just reason to delay the entry of final judgment as to the issues other than attorneys' fees in this action, the Court will direct the entry of final judgment on plaintiffs' other claims.
The Court adopts the foregoing Memorandum as its findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

ON MOTION FOR AWARD OF ATTORNEYS' FEES
This matter is before the Court on plaintiffs' motion for an award of attorneys' fees *42 in the sum of $20,618.00 pursuant to 42 U.S.C. § 1988. The plaintiffs' attorney Charles A. Newman has submitted an affidavit and time records in support of the motion. These indicate that plaintiffs' three attorneys expended 738.3 hours on this action, representing a fee of $30,928.00. The affidavit also indicates that the fees charged to the plaintiffs were fixed and that the law firm of Thompson & Mitchell has served as counsel to plaintiff Greater St. Louis Health Systems Agency since December of 1977.
The Court has considered the other factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) and approved by the Eighth Circuit in Doe v. Poelker, 515 F.2d 541 (8th Cir. 1975), appeal following remand, 527 F.2d 605 (8th Cir. 1976), rev'd on other grounds 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). In particular, the Court has considered the fact that plaintiffs challenged fourteen sections or subsections of CON, almost all of them on multiple theories including state law claims. As to nine of these fourteen provisions, the Court held that the plaintiffs lacked standing or that their claims were not ripe. An additional two provisions were challenged only on pendent state law grounds, which the Court declined to hear, and as to one of those three provisions on which plaintiffs ultimately prevailed, they were unsuccessful on the first alleged ground of invalidity. The defendants cannot be fairly required to compensate the plaintiffs for time the plaintiffs' attorneys spent pursuing unsuccessful claims. Muscare v. Quinn, 614 F.2d 577 (7th Cir. 1980).
Accordingly, the Court has discounted to one-fifth the number of hours plaintiffs' attorneys spent in unidentified research and in drafting the original complaint and the post-trial brief. The Court has of necessity estimated the proportion of time devoted to research when the time records show a number of tasks in one time entry. The Court has thus reduced 58.3 hours of Mr. Newman's time to 11.7 hours; 181.8 hours of Mr. Hokamp's time to 36.4 hours; and 108.3 hours of Ms. Halpern's time to 21.7 hours. In addition the Court has disallowed those hours devoted by Mr. Hokamp to the issues of standing and jurisdiction, and to unidentified trial preparation because the presence of all three of plaintiffs' attorneys at trial was a duplication of effort. Johnson v. Georgia Highway Express, Inc., supra, at 717. The Court has also discounted to one-half the number of hours spent by Mr. Hokamp preparing the exhibits in this case, which is work which need not be reimbursed at the same rate as strictly legal work. Id. Finally, the Court has discounted those hours devoted by Ms. Halpern to the motion in limine, to the issue of attorneys' fees since those hours were expended before this Court's judgment was entered pointing to § 1988 as a source of authority for an award, and to attendance at trial.
The net result of the above calculations is that plaintiffs will be compensated for 156.9 hours of Mr. Newman's time, at $60.00 per hour, and 145.3 hours of Mr. Hokamp's time and 62.7 hours of Ms. Halpern's time at $35.00 per hour. This totals to a fee of $16,694.00. The Court finds that the impact of the other factors to be considered is more or less evenly balanced between enhancement and detraction.
Finally, the Court finds that it would not be fair to require the intervening defendants to shoulder a portion of the fee award because their challenged conduct was in fact required by § 14.3 of CON.
Accordingly, an award of $16,694.00 in attorneys' fees will be entered in favor of plaintiffs and against defendants Teasdale and Ashcroft. Said defendants were sued only in their official capacities and hence the award will be entered against them in their capacities as officials of the State of Missouri.
NOTES
[1] The Act was amended most recently by the Health Planning and Resources Development Amendments of 1979, Pub.L.No.96-79, 93 Stat. 592.
[2] The intervening defendants in this action are St. Louis County and its Supervisor Gene McNary, and the City of St. Louis and its Mayor James F. Conway.
[3] The Court notes that this designation was conditional and that it expired on August 31, 1979 and could not be renewed due to the limitations of the Act.
[4] Plaintiff GSLHSA's right as a "health systems agency" to receive such notice is also preserved, in view of this Court's action with regard to CON § 2(6), infra.
[5] Both plaintiffs and defendants submitted to the Court a large number of letters and documents representing the views of various officials and employees of the Department of HEW on the legality of provisions of CON. However, not every view of every employee of the federal agency is entitled to this Court's consideration. Only "official positions" are relevant. Such positions may include views expressed in correspondence of a departmental official in the agency's national office, Miller v. Youakim, 440 U.S. 125, 144 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979); however, as noted below, it is not beyond doubt that the view expressed in Mr. Rorrie's letter is entitled to deference. However, as he is the only official in the national office who authored any of the HEW documents before the Court, his views are the only ones arguably entitled to deference.
[6] As Mr. Rorrie's view of the legal effect of § 2(6) coincided with that of the parties and differed from that of this Court, the Court had no occasion above to consider his opinion in relation to this section.