The HARRISBURG HOSPITAL, the Good Samaritan Hospital, Lebanon Valley General Hospital, Philhaven Hospital, and Seidle Memorial Hospital, Plaintiffs,

v.

Richard L. THORNBURGH, Governor, Walter Baran, Secretary of General Services, Pennsylvania State University, Defendants.

Civ. A. No. 84–1755.

United States District Court, M.D. Pennsylvania.

Aug. 27, 1985.

Fred Speaker, Thomas B. Schmidt, III, Stephen L. Grose, Donna L. Fisher, Pepper, Hamilton & Scheetz, Harrisburg, Pa., for plaintiffs.

Joel M. Ressler, Allen C. Warshaw, Dist. Attys. Gen., LeRoy Zimmerman, Atty. Gen., and Henry Barr, Office of Gen. Counsel, Harrisburg, Pa., for Thornburgh and Baran.

Delbert J. McQuaide and R. Mark Faulkner, McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc., State College, Pa., for Penn State.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Plaintiffs and defendants have filed cross motions for summary judgment. Plaintiffs, The Harrisburg Hospital, The Good Samaritan Hospital, Philhaven Hospital, Seidle Memorial Hospital, nonprofit corporations, and Lebanon Valley Hospital, a business corporation, are hospitals located in central Pennsylvania. Defendants are Richard L. Thornburgh, Governor of the Commonwealth of Pennsylvania, Walter Baran, Pennsylvania's Secretary of General Services, and Pennsylvania State University (PSU), the Commonwealth's land grant institution of higher education. The action arises from Pennsylvania legislation, the Act of December 21, 1984, No. 231–1984, exempting PSU from the certificate of need requirement found in the Pennsylvania Health Care Facilities Act, Act of July 19, 1979, P.L. 130, No. 48, 35 P.S. § 448.101 *et seq.* (Purdon Supp.1985), in connection with a specific expansion project contemplated by PSU for the Hershey Medical Center. The Medical Center, a division of PSU, includes a College of Medicine and the University Hospital. The Health Care Facilities Act was enacted in compliance with the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k *et seq.* (The National Act). Plaintiffs' complaint alleges that the exemption legislation violates the Suprema-

cy Clause,[1] the due process and equal protection clauses of the Fourteenth Amendment, U.S. Const. Amend. XIV, § 1, and the National Act.[2] PSU asserts that plaintiffs lack standing to assert the Supremacy Clause claim but, along with the remaining defendants, contends that, in any event, the exempting legislation is constitutional in all respects. The parties have filed a stipulation of facts with attached exhibits, the issues have been fully briefed and argued, and the motions are ripe for disposition. For the reasons set forth below, we conclude that the plaintiffs do have standing to raise all their federal claims but that, under the well established test for granting summary judgment, *see Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469 (3d Cir.1985), judgment must be granted in favor of the defendants.

## II. *Facts.*

The National Act was passed in response to Congress's concern over the rising costs of health care in the United States. *See* 42 U.S.C. § 300k. It is legislation enacted pursuant to the "spending" or "general welfare" clause.[3] *Greater St. Louis Health Systems Agency v. Teasdale,* 506 F.Supp. 23 (E.D.Mo.1980). The Act requires the Secretary of Health and Human Services to establish health service areas throughout the United States, consisting of geographic areas appropriate for the planning and development of health services. 42 U.S.C. § 300*l*(a)(1). A health systems agency (HSA), organized in accordance with criteria set forth in the Act, *id.* at § 300*l*-1, administers each area, providing, in part, health planning for the area. *Id.* § 300*l*-2.

The National Act is not mandatory on the states but, as originally enacted, required them to adopt a program of health planning which conformed to the National Act if they wished to receive funding for programs tied to the Act. *See* 42 U.S.C. § 300m(d). A state establishing such a program had to designate a state agency to administer it, including the provision at the base of the plaintiffs' attack on the exempting legislation, the certificate of need requirement set forth in the National Act. *Id.* at 300m–2(a)(4)(B). This provision of the National Act required that a participating state first determine, through its designated state agency, that, among other things, a health care facility, such as The Hershey Medical Center, show the need for the additional health care services it intended to offer before being permitted to expand. *Id.* at 300n–1(c).

In 1979, in response to the federal law, Pennsylvania enacted the Health Care Facilities Act, *supra.* The Department of Health was designated as the state agency to review requests for expansion by health care facilities. Under the National Act, the counties of Franklin, Adams, Cumberland, Perry, Dauphin, York, Lebanon and Lancaster were designated as the South Central Pennsylvania Health Service Area. Health Resources Planning and Development, Inc. (HRPD) was designated pursuant to the National Act, see *id.* at § 300*l*-4, as the HSA for the area. The plaintiff hospitals and the Hershey Medical Center are located in this service area.

Against this legislative backdrop, in 1982 Pennsylvania decided to turn over to PSU the health care services the state was performing at Elizabethtown Hospital for Children and Youth (Elizabethtown). The Hospital was owned and operated by the state and primarily served children with brain and spinal cord injuries and neuro-developmental disabilities. By the Act of June 22, 1982, P.L. 573, No. 166, the General Assem-

---

1. The Supremacy Clause provides, in relevant part, as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land,...." U.S. Const. art. VI, cl. 2.

2. Plaintiffs also made pendent state claims for relief but abandoned those in light of *Pennhurst State School & Hospital v. Halderman,* 465 U.S.

89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*).

3. U.S. Const. art. I, § 8, cl. 1 provides, in relevant part, that "Congress shall have Power To lay and collect Taxes ... to ... provide for the ... general Welfare of the United States...."

bly made PSU responsible for the services the state was performing at Elizabethtown and established a center at the Hershey Medical Center for that purpose. Because no new services were being contemplated and the transfer at that time represented only the acquisition by PSU of an existing health service, the Department of Health notified Elizabethtown that a certificate of need review was not necessary. Following the passage of Act 166, while awaiting construction of the new center, PSU has operated Elizabethtown through the Hershey Medical Center.

In 1982, the General Assembly supplemented its capital budget for the fiscal year 1981–82 through the Act of December 6, 1982, P.L. 771, No. 222. The supplement authorized the Commonwealth, through its Department of General Services administered by defendant Baran, to construct two projects at the Hershey Medical Center. One project was for the services transferred from Elizabethtown and the other was for the addition of a child psychiatric unit. After the adoption of Act 222, the Hershey Medical Center analyzed the uses to which it wanted to put the appropriated funds and made some revisions to the proposed expansion. In response to a PSU request that appropriations more accurately reflect that expansion, the Commonwealth repealed Act 222, and passed the Act of May 18, 1984, P.L. 263, No. 62. Act 62 appropriated similar amounts of money but reflected the changed purposes for which PSU wanted to use the money. Those now included an in-patient geriatric psychiatric unit. Currently, PSU intends to use the new addition for the following purposes: (1) rehabilitation and outpatient clinic and child psychiatric unit; (2) outpatient surgery unit and child research observation; (3) rehabilitation inpatient unit; (4) occupational and physical therapy unit. There will also be a shell on the ground floor for future expansion. As a result of the new construction, in addition to the beds dedicated to the Elizabethtown transfer, the Hershey Medical Center will have sixty (60) more beds.

In July of 1984, the Department of Health, apparently learning about the new expansion plans through a newspaper article, contacted the Hershey Medical Center concerning the requirement of a certificate of need. PSU wrote to Governor Thornburgh concerning its understanding that a certificate of need would not be required. When the Department of Health insisted that one was required, PSU sought legislative action to exempt the proposed construction. The exempting legislation was thereafter signed into law by Governor Thornburgh on December 21, 1984, and this lawsuit followed shortly thereafter. Plaintiffs request that the proposed expansion undergo the certificate of need review, showing the necessity for the services before construction begins at the Hershey Medical Center.

III. *Discussion.*

A. *Plaintiffs' Standing.*

■ Defendant PSU argues that plaintiffs lack standing to bring a Supremacy Clause challenge to the exempting legislation. PSU claims that the economic injuries that would allegedly result from the expansion without a showing of need are too remote and speculative and not fairly traceable to the defendants' conduct to support standing. Plaintiffs argue the opposite, of course, and, additionally, assert that injury can be shown by the interference with the plaintiffs' rights under federal and state law to show that the proposed construction is not necessary.

The Supreme Court set forth the constitutional standards governing the determination of a party's standing to maintain a lawsuit in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595, 610 (1978) as follows:

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so

largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 7 L.Ed.2d 663, 82 S.Ct. 691 [703] (1962). As refined by subsequent reformulation this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197 [2206], 45 L.Ed.2d 343 (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555 [561], 50 L.Ed.2d 450 (1977).

Contrary to defendant's contention, there are distinct and palpable injuries claimed here. A loss of revenue, even a threatened loss of future revenue, certainly satisfies the injury in fact standard of prior Supreme Court decisions. Defendant's more substantive position is the argued lack of a fairly traceable causal connection between the claimed injury and the challenged conduct. PSU asserts that any loss of future revenues for the plaintiff hospitals would not result solely or primarily from the exempting legislation. It argues that a "myriad" of forces affect the health care industry and that plaintiffs' own business decisions may cause them adverse economic consequences in the future. Hence, the standing requirement is not satisfied here.

In *Duke Power Co., supra*, the Supreme Court, discussing the causal connection element of standing, stated:

The more difficult step in the standing inquiry is establishing that these injuries "fairly can be traced to the challenged action of the defendant," *Simon v. Eastern Ky. Welfare Rights Org.*, [426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976),] or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries. 426 U.S. [26] at 43, 96 S.Ct. 1917 [at 1926], 48 L.Ed.2d 450.

*Id.* at 74, 98 S.Ct. at 2631, 57 L.Ed.2d at 612 (brackets added). The Court further noted that: "Our recent cases have required no more than a showing that there is a 'substantial likelihood' that the relief requested will redress the injury claimed to satisfy the second prong of the constitutional standing requirement. [citations omitted]." *Id.* at 75 n. 20, 98 S.Ct. at 2631 n. 20, 57 L.Ed.2d at 612 n. 20 (brackets added).

In the instant case, plaintiffs point out that federal regulations provide that "[t]here shall be less than four non-federal, short-stay hospital beds for each 1,000 persons in a health service area except under extraordinary circumstances." 42 C.F.R. § 121.201(a). The regulations emphasize that four beds per 1,000 population represents a ceiling, not the optimum number. *Id.* at § 121.201(b). HRPD has determined that only 3.7 acute care beds per 1,000 population is appropriate for the South Central Pennsylvania Health Service Area but the Harrisburg Medical Service Area, a part of the former area, had 4.8 acute care beds per 1,000 population in 1984. (Stipulation of Facts 52, 53, 70).[4]

These facts indicate that the requested relief, i.e., submission by PSU to the certificate of need review, would have a substantial likelihood of redressing the injury claimed. Such a review would take into consideration the excess bed capacity in the health service area caused by the excess in the medical service area. While there may be a myriad of forces influencing a health care provider's costs and revenues, as defendant PSU asserts, we must agree with plaintiffs that an increase in beds in a service area already in excess according to the governmental body charged with making those determinations, will be a major factor in decreasing revenues for health care facilities competing with each other in the same health service area. We do not believe that plaintiffs have to show a "but for" relationship between the challenged conduct and the threatened economic harm

---

**4.** The parties do not explicitly stipulate that a "short-stay" hospital bed is the same as an "acute care" bed but it is clear from their arguments that the two types of beds are equivalent.

to establish standing. It is sufficient to show, as here, that the requested remedy will have the substantial likelihood of bringing about the desired relief. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

PSU cites *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) to support its contention that, because plaintiffs are merely speculating that forcing a Department of Health review here would grant plaintiffs the real relief they seek, prevention of the project, they lack standing. Defendants argue it is not guaranteed that the Department of Health would deny the certificate even if PSU was forced to undergo the review. *Warth,* however, is inapposite. Plaintiffs there included residents of Rochester, New York who sued the nearby town of Penfield, and its zoning hearing board, alleging that the town's zoning ordinance effectively prevented people of low and moderate incomes from living in the town. In connection with the standing of the low and moderate income individuals, the Court stated:

> Here, by their own admission, realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low and moderate cost housing. The record specifically refers to only two such efforts.... But the record is devoid of any indication that these projects, or other like projects, would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners.... In short, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and petitioners' asserted injury.

*Id.* at 506–07, 95 S.Ct. at 2208–09, 45 L.Ed.2d at 359.

Here, of course, plaintiffs, unlike the petitioners in *Warth,* have established facts indicating that their situation would have been better if the defendants had not acted and would improve if the court were to grant relief. We conclude that plaintiffs have standing, based upon threatened economic injury, to assert a Supremacy Clause claim.

Additionally, we believe that plaintiffs can assert standing for injury to perceived procedural rights conferred upon them by the National and state Acts. In *Teasdale, supra,* the court held that the plaintiff HSA and certain individuals had standing to contest provisions of the Missouri law enacted in compliance with the National Act. There, plaintiffs alleged that the state law did not protect certain procedural rights conferred upon them by the National Act. While the court concluded that plaintiffs had no standing to contest the validity of certain state statutory sections because they did not affect plaintiffs' rights under the National Act, it did go on to invalidate a definitional section of the state law because its affect might be to eliminate the state agency's responsibility to notify HSAs within the state of agency decisions on certificates of need. Federal regulations contemplated that an HSA would be able to appeal any decision contrary to its own recommendation. The court concluded that such a requirement:

> is a reasonable one, and one that helps to insure that certificates of need will be granted or denied only after full weight has been given to the views of the local agencies, which are presumably most familiar with the needs of their areas. Accordingly, § 2(6) must be declared invalid for its inconsistency with federal law.

*Id.* at 37.

In the instant case, plaintiffs point out that the exempting legislation has eliminated their right under the federal regulations as "affected persons" to appear before the state agency and contest the proposed expansion. Hence, just as in *Teasdale,* important procedural rights conferred under federal law are being eliminated by state law. We agree and conclude that plaintiffs have standing to challenge the elimination of those rights pursuant to the Supremacy Clause.

## B. *The Supremacy Clause Claim.*

Plaintiffs contend that the exempting legislation violates the Supremacy Clause because the state law exempts the Hershey Medical Center project from undergoing the certificate of need review required by the National Act. Plaintiffs' attack is premised upon two lines of Supremacy Clause cases. One line involves federal laws passed pursuant to Congress's authority under the Commerce Clause [5] or some other constitutional provision. Under these provisions, Congress has the power to regulate conduct directly within all the states and a state law in the same area may be declared invalid. The other line of cases involves Congress's power under the spending or general welfare clause to impose conditions upon how states may spend funds collected under the taxing power of the federal government. The legislation discussed in the latter line of cases, unlike the direct legislation of the former line, is not mandatory on the states or their citizens. A state need not comply with the federal law but does so at the cost of forfeiting the federal funds allocated under it.

As noted previously, the National Act is an example of the latter type of federal legislation. *See Greater St. Louis Health Systems Agency, supra.* The National Act originally tied federal funding from certain programs to a state's enactment of a health care planning statute in conformity to the National Act. The federal law, however, did not require the states to adopt such legislation. Because of the optional nature of the National Act, defendants argue that the Supremacy Clause is simply inapplicable to this case. Moreover, PSU points to

Congress's decision during the past three years to eliminate the financial penalty on states not enacting a certificate of need program as further evidence that Congress does not intend the National Act to be the supreme law of the land.[6] Plaintiffs argue, citing Justice Douglas's concurring opinion in *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), that Congress merely intended with these bills to remove an enforcement provision the government was hesitant to use except in extreme circumstances. They maintain that the substantive provisions of the National Act are still in force and require a participating state to enforce a certificate of need program.

After careful review of the parties' arguments and the case law, we conclude that the exempting legislation is not barred by the Supremacy Clause for the following reasons.

The parties agree that, as originally enacted, the National Act was spending clause legislation. The essential rationale of those cases enforcing spending clause legislation on the states was that the federal government could validly attach conditions to a state's receipt of federal funds. The rationale was not, as plaintiffs imply, merely because the state law or regulations had to conform with federal law. Thus, although the Supremacy Clause is cited in support of invalidating the non-conforming state law, the case law has made clear that this is accomplished on the underlying theory that the federal government can control how federal funds are spent. Thus, for example, in *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the Supreme Court justified imposing federal re-

---

**5.** U.S. Const. art. 1, § 8, cl. 3.

**6.** In three separate, continuing appropriations bills for fiscal years 1983, 1984, and 1985, Congress has, in funding programs, kept in force the following provision, first appearing in Pub.L. 97–377, art. V, § 512(2), 96 Stat. 1830, 1905–06, and incorporated by reference in the subsequent bills:

"notwithstanding section 102 of this joint resolution, no penalty shall be applied nor any State or agency agreement terminated pursuant to

sections 1512 [42 U.S.C. § 300*l*–1], 1515 [42 U.S.C. § 300*l*–4] or 1521 [42 U.S.C. § 300m] of the Public Health Service Act...." (brackets added). *See also* Pub.L. 98–151, 97 Stat. 964, 972; Pub.L. 98–473, 98 Stat. 1837, 1963.

Although this language appears in an appropriations bill, there is no dispute that it has substantively amended the National Act. *See United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). The parties only argue as to the effect of the amendment.

quirements under the federal government's aid to families with dependent children program upon the state of Alabama because the Social Security Act conditioned receipt of federal funds upon compliance with federal requirements. The Court stated:

> There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid. [citations omitted].

*Id.* at 333 n. 34, 88 S.Ct. at 2141 n. 34, 20 L.Ed.2d at 1134 n. 34 (brackets added). Similarly, in *Page v. Preisser*, 585 F.2d 336 (8th Cir.1978), involving another attack upon a state aid to families with dependent children program, the court stated: "Those states that choose to receive federal funds under the program must submit to the Secretary of HEW [Health, Education and Welfare] a plan that conforms to the Social Security Act and the regulations promulgated by HEW." *Id.* at 340 (brackets added).

In *Williams v. Wohlgemuth,* 540 F.2d 163 (3d Cir.1976), the Third Circuit Court of Appeals struck down a Pennsylvania statute which defined too narrowly the type of emergency for which the state would supply benefits under an emergency assistance program partially funded by the federal government. That holding was bottomed on Congress's power to condition the disbursement of federal funds to the states. There, the court noted that plaintiffs' argument was based upon the plaintiffs' interpretation of "the kind of program that Congress insisted that the states adopt if they are to receive federal financial aid." *Id.* at 168.

Finally, in *Woman's Community Health Center of Beaumont, Inc. v. Texas Health Facilities Commission,* 685 F.2d 974 (5th Cir.1982), dealing with the National Act itself, the court stated: "The theory underlying the constitutionality of the Federal Act's 'requirement' that the states pass and enforce legislation is that the states have chosen to accept this duty as a condition for receiving federal grants. [citations omitted]." *Id.* at 980 n. 14 (brackets added).

Significantly, none of these cases dealt with a plaintiff trying to impose federal conditions upon a state refusing to accept federal funds, or more to the point, upon a state receiving federal funds which are not conditioned upon the state's meeting any federal requirements. In connection with the former situation, the Third Circuit Court of Appeals has stated in *Williams, supra:*

> We do not, of course, require that Pennsylvania continue to accept federal funds for an emergency assistance program. But if such funds are used, the guidelines established by Congress must be followed.

540 F.2d at 170 n. 37.

The obvious conclusion to draw from this language is that a state is free to legislate in a particular area, despite federal spending clause legislation in the same field, if the state is willing to forego federal funding and even if a state had previously tried to conform to federal standards. The same result should follow if the federal government, on its side, is willing to supply federal funds regardless of the standards established by a particular state. Accordingly, we conclude that, because no conditions were imposed upon receipt of funds allocated under the National Act, Pennsylvania was free to amend its state law without considering the substantive requirements of that Act. It follows that the Supremacy Clause was not violated because nothing in the federal law required Pennsylvania, at the time it enacted the exempting legislation, to maintain a certificate of need requirement as to any hospital expansion project.

We reject plaintiffs' argument that the congressional action during each of the last three years simply removed an enforcement provision from the National Act but left its substantive provisions in force, re-

quiring a participating state to maintain its certificate of need review for all projects. First, we fail to see how Justice Douglas's concurring opinion in *Rosado, supra,* helps plaintiffs. There, Justice Douglas, discussing the propriety of a district court's assumption of jurisdiction over a claim when the same issue is before the agency charged with enforcing state compliance with federal standards, noted the natural reluctance of the federal agency involved in that case (HEW) to cut off money to a non-complying state. He observed that the agency often chooses to negotiate informally rather than impose such a drastic sanction. An agency's reluctance to use its ultimate power at some point in its negotiations with a state to bring the latter into line has no bearing upon a congressional decision to forego completely the right to cut off funding. In our view the latter conduct is a clear signal of federal intent to free states from the requirements of federal law. It eliminates completely the agency's discretion in negotiating with the states.

Second, it hardly seems likely that Congress would have eliminated its strongest weapon if it intended, as plaintiffs assert, to require participating states to adhere to the substantive provisions of the National Act. Plaintiffs' argument might have some substance if there was a specific provision in the National Act forbidding a state from repealing a law adopted pursuant to the Act. The federal legislation, however, is completely silent in this regard. Such a prohibition could only have arisen implicitly from those sections of the National Act, now amended by the continuing appropriations bills, allocating federal funds only upon satisfying the conditions of the Act. Those bills broadly provided that "no penalty shall be applied nor any State or agency agreement terminated" if a state was not in compliance. See note 6, *supra.* This language clearly contemplated that an already complying state, in the exercise of its sovereign power, could

repeal an already enacted certificate of need program without fear of financial penalty. Otherwise, the language would not have prohibited the *termination* of agency agreements.

Plaintiffs' argument also seems to run aground of the Tenth Amendment.[7] In *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), the Court rejected a Tenth Amendment objection to certain provisions of the Public Utility Regulations Policies Act of 1978, 16 U.S.C. § 2601 *et seq.,* because the legislation only required the states to consider, but not to enact, federal standards in rate making and other public utility regulations. The Court, citing *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), observed there that a federal law mandating that the states adopt certain regulations, the interpretation of the National Act plaintiffs wish us to adopt, would be of doubtful constitutional validity.

Our conclusion that the Supremacy Clause is not violated also follows from standard Supremacy Clause analysis. This analysis is absent in spending clause cases which, while they rely upon the Supremacy Clause, do so only in a summary fashion. We believe that this detailed analysis is inappropriate in a spending clause case but we will discuss it briefly to show that plaintiffs' Supremacy Clause claim must fail under this standard as well. In *Hillsborough County v. Automated Medical Laboratories, Inc.,* —— U.S. ——, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985), the Supreme Court set forth the test as follows:

> Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. *Jones v Rath*

---

7. The Tenth Amendment provides, in relevant part, as follows: "The powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively, or to the people."

*Packing Co.*, 430 US 519, 525, 51 L Ed 2d 604, 97 S Ct 1305 [1309] (1977). In the absence of express pre-emptive language, Congress' intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice v Santa Fe Elevator Corp.*, 331 US 218, 230, 91 L Ed 1447, 67 S Ct 1146 [1152] (1947). Preemption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Ibid.; see *Hines v Davidowitz*, 312 US 52, 85 L Ed 581, 61 S Ct 399 (1941).

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 142–43, 10 L Ed 2d 248, 83 S Ct 1210 [1217–18] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, supra [312 U.S. 52] at 67, 85 L.Ed. 581, 61 S.Ct. 399. See generally *Capital Cities Cable, Inc. v. Crisp*, 467 US ——, ——, 81 L Ed 2d 580, 104 S Ct 2694 [2700] (1984).

*Id.* at ——, 105 S.Ct. at 2375, 85 L.Ed.2d at 721.

First, Congress did not expressly state in the National Act its intent to pre-empt all state law on health care planning. Second, such an intent cannot be inferred from the regulatory scheme which, while comprehensive, is entirely voluntary with the states. Congress must have intended "to leave room" for the states to legislate in this

area if it permitted such a choice. Third, the federal interest in health care planning is not so dominant that it can be assumed to preclude enforcement of state laws on the same subject. In *Hillsborough County*, the Court, upholding a local ordinance regulating blood donations against a Supremacy Clause challenge based upon federal regulation of the same subject, relied, in part, on "the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Id.* at ——, 105 S.Ct. at 2376, 85 L.Ed.2d at 722. The Court further stated:

"Where . . . the field that Congress is said to have pre-empted has been traditionally occupied by the States 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Jones v. Rath Packing Co.*, [430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) ] (quoting *Rice v. Santa Fe Elevator Corp.*, [331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) ]).

*Id.* at ——, 105 S.Ct. at 2376, 85 L.Ed.2d at 722–23 (brackets added).

In regard to the remaining two factors, as we established above, the exempting legislation is not in conflict with federal law, and, consequently, cannot stand as an obstacle to the accomplishment of Congress's purpose when congressional action freed Pennsylvania to eliminate its certificate of need program.

We conclude that the exempting legislation is not invalid under the Supremacy Clause.

### C. The Due Process Claim.

█ "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the due process clause." [8] *Memphis Light, Gas and Water*

---

**8.** The Amendment also protects life and liberty but none of the parties asserts that either of

these interests is implicated here and we agree.

Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30, 39 (1978). Accordingly, plaintiffs' due process claim must be subjected to the following, "familiar" inquiry: (1) were the plaintiffs deprived of a protected interest, and, if so, (2) what process was due them. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Plaintiffs challenge the exempting legislation on due process grounds because it eliminates plaintiffs' right under the Health Care Facilities Act to appear before the state agency and object to the Hershey Medical Center expansion.[9] Citing *Clover Farms Dairy v. Brumbaugh*, 586 F.Supp. 1227 (M.D.Pa.1984); *Hixon v. Durbin*, 560 F.Supp. 654 (E.D.Pa.1983); *Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6 (W.D.Pa.1981); *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980), plaintiffs assert that they have a property right "in the non-arbitrary exercise of discretion" by the state agency in reviewing a certificate of need. (Plaintiffs' brief in support of their motion for summary judgment at 40). Defendant PSU contends that plaintiffs' right is a cause of action. It reasons that, because a state can generally eliminate a cause of action at any time, *see Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), plaintiffs' right cannot constitute property which has been defined, inter alia, for the purposes of the Due Process Clause, as an individual entitlement conferred by the state which cannot be removed except for cause. *See Logan, supra*. Defendants Thornburgh and Baran assert simply that a state can eliminate a substantive right created under state law. After careful review of the pertinent case law, we agree with the latter defendants but differ in our analysis in concluding that plaintiffs have failed to establish a constitutionally protected property right.

"A survey of the history of due process reveals a steady expansion in protected rights." *Town Court Nursing Center,*

*Inc. v. Beal*, 586 F.2d 280, 285 (3d Cir.1978) (Adams, J., concurring), *rev'd sub. nom., O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (footnote omitted). No doubt this is the result of the Supreme Court's wise refusal to impose strict definitions upon "liberty or "property" as those words appear in the Fourteenth Amendment. In *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548, 560 (1972), involving a claim of a constitutionally wrongful discharge from employment as a college professor, the Court stated: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms." The Court generally concluded that property interests:

> are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly*, [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)], had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them.... Just as the welfare recipients' "property" interest in welfare payments was created and defined by statutory terms, so the respondent's "property" interest in employment ... was created and defined by the terms of his appointment.

*Id.* at 577–78, 92 S.Ct. at 2709, 33 L.Ed.2d at 561 (brackets added).

Use of the *Roth* analysis is also appropriate here because the plaintiffs are similarly claiming a property interest in a benefit allegedly created and defined by the National Act and the Health Care Facilities Act. *See Three Rivers Cablevision, supra*. Essentially, that was the analysis

---

**9.** This is a procedural due process claim. In their complaint, plaintiffs also alleged a viola-

tion of substantive due process but did not brief that claim and we consider it abandoned.

used in all the cases cited by plaintiffs except *Clover Farms Dairy* and it is clear from the facts of that case that, in any event, it is in accord with *Roth*.

Initially, we note, however, that plaintiffs have read too much into these cases. They are cited as authority for the proposition that plaintiffs have a property interest in the non-arbitrary exercise of discretion on the part of state decisionmakers when state law establishes criteria to guide the state officers. State established criteria, however, take the plaintiffs only partially to establishing a protected property interest under the cited cases. The courts in these cases did not conclude that a property interest existed until they first found a benefit intended to be conferred upon plaintiffs, defined by the statute or ordinance involved in those cases. Whether or not the decisionmakers' authority was limited by legislative provisions played only a part in determining whether that benefit existed. We believe plaintiffs here are confusing the process due with the protected property interest. In *Three Rivers Cablevision,* the court was careful to keep those elements distinct. It prefaced its analysis of the due process claim there by noting that:

> [T]o the extent that plaintiffs are pleading the deprivation of a protected interest as a result of council's failure to apply the provisions of the CCO [the local cable ordinance] and RFP [a "Request for Proposals" containing conditions on bids] to Warner, plaintiffs' protected *interest* and the *process due* obviously are one and the same, for the process they seek is, of course, adherence to the said provisions. In short, there can be no property interest in a procedure itself; if there be a protected interest involved here, it is to be found in the *benefit* whose enjoyment is sought to be regulated by the procedure; namely, the award of the contract.

*Id.* at 1128–29 (brackets added) (emphasis in original).

The court concluded that the protected property interest was "the right of the lowest responsible bidder in full compliance with the specifications to be awarded the contract once the city in fact decided to make an award." *Id.* at 1131. The court then went on to identify the process due, which the plaintiffs here incorrectly identify as the protected property interest: "The due process to which one possessing the protected interest was entitled was the non-arbitrary exercise by the city of its discretion in making the award." *Id.* The other cases cited by plaintiffs are in accord. Thus, in *Teleprompter, supra,* the protected interest was the award of a cable television franchise. In *Hixon,* the interest was an employment contract with the state and in *Clover Farms Dairy,* the interest was the minimum pricing schedule set by the Pennsylvania Milk Marketing Board. We do not believe that plaintiffs here have articulated an equivalent interest.

Under *Roth,* since plaintiffs are claiming a property interest arising from legislation, we must examine the relevant federal and state legislation to determine if these laws were intended to confer a benefit upon plaintiffs. *See Klein v. Califano,* 586 F.2d 250 (3d Cir.1978). After review of the National Act and the Health Care Facilities Act we agree with plaintiffs that, in the posture of this case, such a benefit can only arise from the provisions of these laws giving plaintiffs the right to appear and contest the granting of a certificate of need to another health care facility, but we do not believe that this right rises to the level of property for the purposes of the Due Process Clause. The National Act, and its implementing state law, were not passed to benefit health care facilities. To the contrary, the laws were enacted to regulate them because marketplace competition among them could not control health care costs. The congressional findings set forth in the National Act speak of maldistribution of health care facilities, the increasing cost of health care and the need for planning at the national and state level. 42 U.S.C. § 300k. These concerns are echoed in the Pennsylvania Act whose purposes include the enhancement of the health and welfare of the state's citizens by the order-

ly and economical distribution of health care resources. 35 P.S. § 448.102 (Purdon Supp.1985). Hence, unlike the statutes under consideration in prior cases, the legislation here is not intended to confer a direct benefit upon plaintiffs. *See, e.g. Town Court Nursing Center, Inc. v. Beal, supra,* at 285 n. 6 (Adams, J., concurring). Rather, it is intended to regulate health care providers generally to achieve the societal goal of the efficient use of resources in the health care industry. To achieve that goal, the legislation logically permits competing health care facilities to contest the grant of a certificate of need but this right conferred upon "affected persons" was intended merely as assistance to the decisionmaker in developing an accurate picture of the circumstances surrounding the request for the certificate.[10] "[T]he statute manifests no congressional intent to protect the financial interests of health care providers." *Dialysis Centers, Ltd. v. Schweiker,* 657 F.2d 135, 139 (7th Cir.1981) (discussing the Social Security Act's End Stage Renal Disease Program) (brackets added). In sum, plaintiffs here have only established that the statute recognizes their importance in certificate of need reviews, but a person may be an important, or even critical witness, but this does not give him a constitutional right to testify. *O'Bannon, supra,* 447 U.S. at 784 n. 15, 100 S.Ct. at 2474 n. 15, 65 L.Ed.2d at 517 n. 15.

We concede that plaintiffs' economic interests are indirectly affected by the exempting legislation. The Hershey Medical Center will be able to treat patients who may not have gone to the facility before its expansion. It is the nature of the interest involved, however, rather than its weight which determines whether it is protected by due process, *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 459 (1976), and plaintiffs plain-

ly have no justifiable expectation or protectible property interest in the treatment of specific patients who are free to seek treatment at any hospital. *See Dialysis Centers, Ltd., supra.* Additionally, the Due Process Clause does not apply to the indirect adverse effects of governmental action. *O'Bannon, supra; Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Dialysis Centers, Ltd., supra.*

Even if plaintiffs had a property interest arising from the National Act and the Health Care Facilities Act, they still received all the process that was due them under the circumstances. We are dealing here with an act of the legislature and not with conduct of state actors in violation of state law. In *Martinez v. California, supra,* the Supreme Court held that a California statute which immunized members of a parole board from tort liability did not violate the Due Process Clause. Plaintiffs' decedent had been murdered by a parolee five months after he was released from prison by parole officials but the immunity statute barred a suit against the officials. The Court reasoned as follows:

Nor can the statute be characterized as an invalid deprivation of property. Arguably, the cause of action for wrongful death that the State has created is a species of "property" protected by the Due Process Clause. On that hypothesis, the immunity statute could be viewed as depriving the plaintiffs of that property interest insofar as they seek to assert a claim against parole officials. But even if one characterizes the immunity defense as a statutory deprivation, it would remain true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in

**10.** "Affected persons" includes others besides health care facilities. The term includes, for example, people living in the area intended to be served by the new services. *See* 42 C.F.R. § 123.401 (1984); 35 P.S. § 448.103. These people may not necessarily object to new health care services. Pennsylvania would also create a

class of "directly affected persons" *see* 35 P.S. § 448.103, of which plaintiffs and consumers of health care would also be part of, but whose rights differ only in degree and not in kind, from those of "affected persons." *See* 35 P.S. § 448.703.

protecting the individual citizen from state action that is wholly arbitrary or irrational.

*Id.* at 281–82, 100 S.Ct. at 557, 62 L.Ed.2d at 487 (footnote omitted).

The court concluded that the immunity statute was constitutional because it was rationally related to California's desire to insure parole officials free exercise of their discretion.[11]

In the instant case, the Pennsylvania General Assembly noted in the exempting legislation that it had transferred the services provided at Elizabethtown to the Hershey Medical Center "to remove the state government from the direct provision of health care services which was found to be inefficient and to enhance the delivery of health care services to the citizens of the Commonwealth." Act of December 21, 1984, No. 231–1984, § 3(a)(1). It also declared that the purpose of the Act of December 6, 1982, P.L. 771, No. 222–1982, providing for the construction of a facility at the Hershey Medical Center to handle the transferred services and a psychiatric unit, was, in part, "to establish a hospital facility in Central Pennsylvania to provide psychiatric services for the citizens of the Commonwealth, and to enhance the medical education opportunities provided by the Pennsylvania State University, which is the land grant university of the Commonwealth, by increasing the size and capacity of the hospital at the Milton S. Hershey Medical Center to approximately 500 beds." *Id.* at § 3(a)(2). The legislature concluded that its previous legislative acts dealing with the Hershey Medical Center "meet the obligations of the Commonwealth to its land grant university, serve the interest of the Commonwealth in eliminating unnecessary cost in the operation of state government and serve the interest of the Com-

monwealth in enhancing the quality of medical care for the citizens of the Commonwealth." *Id.* at § 3(b).

Despite plaintiffs' vigorous and not unmerited objections to the contrary,[12] we cannot conclude that these reasons are *"wholly* arbitrary or irrational." *Martinez, supra,* 444 U.S. at 282, 100 S.Ct. at 557, 62 L.Ed.2d at 487. (emphasis supplied). Accordingly, the due process claim must be rejected.

Plaintiffs lost an important right when the exempting legislation was passed. In our view, the stipulated facts indicate that PSU would have had great difficulty in obtaining a certificate of need if it had been required to go through the normal review process for this particular project. Aside from future economic harm to the plaintiffs themselves, the public interest in rational health care planning also may have been affected by the exemption. But not *"any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum v. Fano, supra* 427 U.S. at 224, 96 S.Ct. at 2538, 49 L.Ed.2d at 458. (emphasis in original). Moreover, the Clause "is not a catch-all provision designed to promote the interest of society generally in the obedience of its laws." *Three Rivers Cablevision, supra,* 502 F.Supp. at 1128. We turn now to the equal protection claim.

### D. *The Equal Protection Claim.*

■ Plaintiffs claim an equal protection violation because they remain subject to the certificate of need requirements of the national and state acts while PSU has been exempted for this particular project. In passing upon the equal protection claim we must bear in mind that "the judiciary may

---

**11.** We reject defendants' contention that due process does not apply here merely because the challenged action is passage of legislation. The cases cited, *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) and *Rogin v. Bensalem Township,* 616 F.2d 680 (3d Cir.1980), *cert. denied sub nom., Mark-Garner Associates, Inc. v. Bensalem Township,* 450 U.S. 1029, 101 S.Ct.

1737, 68 L.Ed.2d 223 (1981), dealt with legislation of general application. In the instant case, the exempting legislation applies only to PSU and one project at the Hershey Medical Center.

**12.** Plaintiffs' argument is discussed more specifically below in dealing with their equal protection claim.

not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976) (per curiam). Accordingly, both sides agree that this claim should be tested "under the lenient standard of rationality that [the Supreme] Court has traditionally applied in considering equal protection challenges to regulation of economic and commercial matters." *Exxon Corporation v. Eagerton,* 462 U.S. 176, 195–96, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497, 513 (1983). "Under that standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Id.* at 196, 103 S.Ct. at 2308, 76 L.Ed.2d at 513. Put another way:

> [T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171, 184 (1979) (brackets added).

The legislative purposes in enacting the exempting legislation have been set forth in detail in our discussion above concerning plaintiffs' due process claim. If any one of them is justified, we cannot strike down the exempting legislation. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Plaintiffs present compelling arguments to rebut the reasonableness of the legislature's reliance on its stated reasons. Specifically, in light of the following facts, it is difficult to accept that the proposed expansion will enhance the quality of medical care for the people of the Commonwealth or eliminate unnecessary costs in the operation of state government.

The only interest the Commonwealth had in eliminating costs in the operation of state government related to its operation of Elizabethtown and originally, the proposed expansion was to encompass only services transferred from Elizabethtown. The project, however, has clearly gone beyond that to include an additional sixty beds not contemplated as replacements for Elizabethtown but as expansion of other services which were not being carried on directly by the Commonwealth at Elizabethtown. Therefore, it is difficult to find a rational relationship between the various pieces of legislation and the state's interest in cutting the costs of operating the government.

It is also difficult to see how the proposed expansion will enhance the quality of medical care for state residents. HRPD had established an objective of 3.7 acute care hospital beds per 1,000 persons for its service area. (Stipulation of Facts 52). In 1984, there were already 4.8 acute care beds for 1,000 persons for the Harrisburg medical service area, and even if the Hershey Medical Center's beds devoted to patients outside the Harrisburg service area were excluded from the calculation, this leaves 4.2 acute care beds per 1,000 persons. (Stipulation of Facts 55). Additionally, at about the same time, HRPD was recommending that another health care facility's request to permit renovation of space merely for future expansion be denied. (Stipulation of Facts 69).

Nevertheless, we cannot conclude here that the General Assembly is not pursuing a legitimate state interest. PSU is the state operated university and the Hershey Medical Center provides a clinical training ground for students at the Hershey Medical School. All of the legislation involved in this action has as one of its stated purposes the enhancement of the medical education opportunities provided by PSU. Plaintiffs do not contend that this reason is specious and, in fact, fail to address it at all. They have stipulated that: "At present, approximately half of the clinical training of third and fourth year medical students in the Hershey Medical Center occurs in other hospitals in the Harrisburg medical service area. The additional beds for inpatient care resulting from construc-

tion authorized by the Act of May 18, 1984, will permit the College of Medicine to provide more clinical training for third and fourth year medical students within the University Hospital." (Stipulation of Facts 44.) This expansion will therefore serve the needs of the state run medical school and for this reason alone we believe the exempting legislation survives an equal protection challenge.

**E.** *The Claimed Violation of the National Act.*

We do not believe we have to reach this issue because our conclusion on the Supremacy Clause argument disposes of plaintiffs' direct claim under the National Act. We have reviewed the cases cited by both sides, however, and would have concluded that, in any event, the National Act did not create a cause of action on plaintiffs' behalf. *See Community Psychiatric Centers of Oregon v. Grant,* 664 F.2d 1148 (9th Cir.1981).

We will issue an appropriate order.