**Douglas FISHEL, Sr., et al., Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, et al., Defendants.**

**Civ. A. No. 85–0216.**

United States District Court, M.D. Pennsylvania.

Oct. 1, 1985.

Albert J. Slap, Gerald J. Williams, Slap & Williams, Philadelphia, Pa., for plaintiffs.

Thomas W. Scott, Killian & Gephart, Harrisburg, Pa., for defendant Frederick Shealer.

Terry R. Bossert, McNees, Wallace & Nurick, Harrisburg, Pa., Jacob P. Hart, Schnader, Harrison, Segal & Lewis, Philip J. Katauskas, Maida Rosenfeld Crane, Alison M. Benders, Philadelphia, Pa., for Westinghouse Elec. Corp. et al.

Jordan D. Cunningham, Harrisburg, Pa., for Sara Kulp and Anna Wishard.

### MEMORANDUM

CALDWELL, District Judge.

I. *Introduction*

Defendant, Westinghouse Electric Corporation (Westinghouse), has filed a motion to dismiss. The numerous plaintiffs in this action oppose that motion and have filed their own motion for partial summary judgment. Plaintiffs are neighbors of Westinghouse's plant in Gettysburg, Pennsylvania, and of sites used by defendant, Frederick M. Shealer, to dispose of industrial wastes generated at the Gettysburg plant. The complaint alleges, *inter alia*, violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* (CERCLA), the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* (RCRA), and the Clean Water Act of 1977, 33 U.S.C. § 1251 *et seq.* (CWA), in connection with the disposal of the wastes.

II. *Discussion*

A. *Procedural Aspects of the Motions.*

Before turning to the merits of the motions, we will address some procedural aspects raised by defendant. First, as defendant correctly points out, because it has submitted an affidavit in support of its motion to dismiss, we should treat that motion as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). Defendant also points out some defects in plaintiffs' motion. It argues that the exhibits and affidavit submitted by plaintiffs in support of their counter-motion for summary judgment are defective in the following respects. The documents, consisting of governmental reports and letters concerning the various sites, allegedly cannot be considered because they were not authenticated. Plaintiffs have cured that defect in their reply brief, however, by submitting affidavits from appropriate governmental officials, attesting to their authenticity and that they are copies of official reports.

Defendant, next argues that the affidavit of Michael C. Havener, plaintiffs' expert, is defective because: (1) he makes legal conclusions on ultimate issues; (2) he invades the fact finders' role by actually weighing the evidence; (3) his conclusions are often tentative and not based upon any standard of reasonable scientific certainty and; (4) generally, expert opinion should not form the basis of a summary judgment motion.

Some of these objections are well taken but we believe that we do not have to rely upon the affidavit at all to reach the merits

of plaintiffs' motion. The affidavit simply summarizes the findings of the investigators of the sites and Havener has not brought his expertise to bear on the case. Defendant does not contest the accuracy of the documents and we will rely upon the Havener affidavit solely as a guidepost to the information contained in the reports which can be considered substantive evidence. See Fed.R.Evid. 803(6), (8).

We turn now to the merits of the motions.

### B. *Plaintiffs Do Not Need Prior Governmental Approval to Assert a CERCLA Claim.*

■ The CERCLA claim against Westinghouse is predicated upon 42 U.S.C. § 9607(a)(2), (3) and 4(B) which provides, in pertinent part, as follows:

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, . . . shall be liable for—

. . . .

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

Plaintiffs allege that this section authorizes their private lawsuit against Westinghouse and other responsible defendants for recovery of their response costs. Westinghouse, conceding that the section creates a private cause of action, nevertheless, contends that for the recovery to be "consistent with the national contingency plan," plaintiffs must first obtain governmental approval from the federal or state govern-

ment of their response costs before seeking recovery from persons made responsible under CERCLA.[1]

There is a split of authority in the district courts concerning this issue. Some courts have held that governmental approval of the private party's plan for cleaning up the hazardous wastes is necessary prior to bringing suit. *See, e.g., Artesian Water Co. v. Government of New Castle County,* 605 F.Supp. 1348 (D.Del.1985) (requiring governmental approval for long term remedial action); *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437 (S.D.Fla.1984); *Wickland Oil Terminals v. Asarco, Inc.,* 590 F.Supp. 72 (N.D.Cal. 1984). Others have held that such prior approval is not necessary. *See Pinole Point Properties, Inc. v. Bethlehem Steel Corp.,* 596 F.Supp. 283 (N.D.Cal.1984); *Homart Development Co. v. Bethlehem Steel Corp.,* 22 Env't Rep.Cas. (BNA) 1357 (N.D. Cal.1984).

Courts that have required prior government approval have generally relied upon provisions in the NCP detailing appropriate governmental action in connection with a hazardous waste site as well as general policy considerations leading the court to conclude that the government should be involved in any response action, governmental or private. *Bulk Distributions Centers* is illustrative. There, the court noted that, in dealing with the release of a hazardous substance, the "lead agency" (federal or state) must make a preliminary assessment of the release, 40 C.F.R. § 300.-64, and that the agency continues under the regulations to have an active role in developing a response to the problem. Further, the court reasoned that, in its view:

[T]he only practical way to safeguard the public's interest, while fairly mediating the competing concerns of the parties potentially responsible for cleaning up the release, is for the government to approve the clean-up proposal before it is implemented by the private parties.

---

1. The "national contingency plan" (NCP) is found at 40 C.F.R. § 300 *et seq.* It was promulgated by the Environmental Protection Agency (EPA), pursuant to delegated authority from the President, to establish guidelines for appropriate responses to environmental hazards. *See* 40 C.F.R. §§ 300.1, 300.2.

The government certainly is in a better position than are private parties to pass judgment on the efficacy of a clean-up proposal. To begin with, state or federal environmental agencies possess scientific and technological sophistication, along with an appreciation of the problems arising from hypertechnical environmental standards. Additionally, the clean-up proposal must comply with laws that the state or federal governments enforce, so it follows that their approval of a plan would be desirable to reduce a party's exposure to liability. *See generally Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897 (6th Cir.1983).

*Id.* at 1446 (brackets added).

*Homart Development Corp., supra*, exemplifies the opposite position. There, the court concluded that prior governmental approval was not necessary because CERCLA contemplated a "dual approach to the cleaning up of hazardous wastes," 22 Env't.Rep.Cas. at 1367: (1) federally funded clean-up of waste sites and (2) because federal funds were limited, private clean-ups funded by lawsuits against private parties. The liberal purpose of the Act in attempting to clean up environmental hazards would be fulfilled by permitting private actions with the question of whether the costs were consistent with the national contingency plan to be resolved at trial.

The *Bulk Distributors* approach is not without its merits but we believe that the courts in *Homart Development Corp.* and *Pinole Point Properties, Inc., supra*, have adopted the better view. It places the clean up of hazardous waste sites upon the responsible parties without placing a financial burden upon the government. In this regard, it is significant that prior governmental approval is only specifically required in the Act when reimbursement for response costs is sought from the government. *See* 42 U.S.C. § 9611(a)(2).

Our interpretation of CERCLA is in accord with the EPA's recent, proposed modifications of the NCP. Those modifications clearly would not require a private party to seek EPA approval before instituting a re-sponse cost recovery action against responsible parties. *See* 50 Fed.Reg. 5,879 (1985) (to be codified at 40 C.F.R. § 300.61(e)). *Compare Artesian Water Co., supra* (prior governmental approval required based, in part, on interpretation of current regulations indicating that EPA had rejected unlimited right of individuals to sue for response costs).

### C. Group IV Has Alleged That They Have Incurred Response Costs.

Group IV consists of neighbors who reside near the Hunterstown Road site and who have not experienced any contamination of their wells. Defendant contends that they cannot maintain a CERCLA action because they have not alleged that they have incurred some response costs. Such response costs are necessary before a CERCLA action can be brought. *See Bulk Distribution Centers, supra.* While the complaint is not as clear as might be desired in this regard, we believe that it adequately sets forth a claim that Group IV has, in fact, incurred response costs (see complaint, ¶ 307) and accordingly sets forth a valid CERCLA claim.

### D. Plaintiffs' Gave Proper Notice of Their RCRA and CWA Causes of Action.

Section 7002(b)(1) authorizes a private cause of action under RCRA provided that "[n]o action may be commenced" under that section "prior to sixty days after the plaintiff has given notice of the violation ... to any alleged violator." 42 U.S.C. § 6972(b)(1). The CWA contains a similar provision. *See* 33 U.S.C. § 1365(b)(1)(A). Defendant contends that the claims under these Acts should both be dismissed because the combined notice it received of them was deficient. In support of dismissal of the RCRA claims, defendant also cites the notice regulation contained in 40 C.F.R. § 254. For dismissal of the CWA claim, Westinghouse cites *Loveladies Property Owners Ass'n v. Raab*, 430 F.Supp. 276 (D.N.J.1975), *aff'd mem.* 547 F.2d 1162 (3d Cir.1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977).

Defendant does not contend that plaintiffs violated the sixty day waiting period; only that substantively the notices were deficient. Specifically, Westinghouse complains that plaintiffs' allegations are sweeping, nonspecific and fail to set forth, as required by 40 C.F.R. § 254.3(a), the specific permit, standard, regulation, condition, requirement or order allegedly violated, the activity causing the violations, the persons responsible for the violations, and the dates of the violations.[2]

In construing the statutory notice provisions, we are guided by *Proffitt v. Commissioners, Township of Bristol,* 754 F.2d 504 (3d Cir.1985). There, discussing the notice provisions at issue in the case at bar, the Third Circuit Court of Appeals, stated:

> The purpose of the sixty-day notice requirement is to obviate the need for resort to the courts by prompting either administrative enforcement of the laws or voluntary compliance by alleged violators. *See, e.g., Susquehanna Valley Alliance v. Three Mile Island,* 619 F.2d 231, 243 (3d Cir.1980); *Friends of the Earth v. Carey,* 535 F.2d 165, 175 (2d Cir.1976) (construing identical notice provision of the Clean Air Act, 42 U.S.C. § 7604(b)(1)(A) ).
>
> Nevertheless, these citizen suit provisions evince a legislative intent that "citizen[s] are not to be treated as nuisances or troublemakers but rather as welcome participants in the vindication of environmental interests." *Friends of the Earth,* 535 F.2d at 172. Mindful of this legislative intent, this and other courts have consistently held that the sixty-day notice provisions should be applied flexibly to avoid hindrance of citizen suits through excessive formalism. *See, e.g., Pymatuning Watershed Citizens for a Hygienic Environment v. Eaton,* 644 F.2d 995, 996 (3d Cir.1981) (per curiam); *Susquehanna,* 619 F.2d at 243; *Friends of the Earth,* 535 F.2d at 175. Thus in *Susquehanna,* this court held that the notice requirement for a citizen suit under WPPCA is met by a showing that the

defendants and administrative agencies had actual notice of the alleged violations more than sixty days before the suit was filed. *See* 619 F.2d at 243.

*Id.* at 506.

Plaintiffs' notice, and amendment thereto, sets forth the locations of the violations, the names of the people seeking compensation under RCRA and CWA and the alleged violations of the Acts, including storing and disposing of hazardous wastes without a permit, maintaining an open dump, creating an imminent and substantial danger to health or the environment, and discharging pollutants into the navigable waters of the United States without a permit. This notice was sent to Westinghouse as a person responsible for the violations.

We reject out of hand Westinghouse's contention that the specific regulations should have been mentioned in the notice. It is sufficient that information easily leading to the regulations was supplied. As we read the notice, it is arguably deficient in failing to set forth: (1) the activity alleged to constitute the violations, and (2) the dates of the violations. We must bear in mind, however, that the regulations required the plaintiffs only to supply *"sufficient information* to permit the recipient to identify" these aspect, among others, of the claim. 40 C.F.R. § 254.3(a). The EPA and the Pennsylvania Department of Environmental Resources (DER) had been conducting investigations of the contaminated sites listed in the notice for many months prior to the date of the notice. In this context, Westinghouse had sufficient actual notice of the alleged violations to respond in an adequate fashion to plaintiffs. Accordingly, their claim of an insufficient notice must be rejected.

E.  *Plaintiffs Have Stated a Good Cause of Action Under RCRA For Violations of the Permit Requirements and Regulations Promulgated Pursuant to That Act.*

Westinghouse next contends that, because it never intentionally used its plant

**2.**  40 C.F.R. § 135.3, dealing with the notice requirements under the CWA, is substantially similar although, of course, it concerns violations of the CWA.

site as a dump, it did not have to meet the permit requirement and regulations promulgated to enforce RCRA in connection with disposal facilities. Conversely, plaintiffs contend that Westinghouse did, in fact, intentionally dump hazardous wastes on its Gettysburg plant site along with some accidental dumping. In addition to cleaning grates used in its factory over a storm drain leading to the water supply for neighbors, plaintiffs argue that the above conduct violates RCRA in respect to hazardous waste facilities and also RCRA open dumping regulations.

After review of the pertinent statutory sections and regulations we conclude that plaintiffs have stated a good cause of action for a hazardous waste facility disposal violation based upon the storage of solvents on two areas of the plant. Plaintiffs have failed to make out an open dumping violation or any violation under RCRA for the use of the storm drain.

Defendant relies upon the affidavit of Kenneth E. Hess, Supervisor of Plant Engineering at the Gettysburg plant. Hess declares that the plant's wastes are currently shipped for off-site disposal and that, when they are on the premises, they are handled in compliance with storage regulations. *See* 40 C.F.R. § 262.34. We agree with plaintiffs that this affidavit is irrelevant to past violations of RCRA. Westinghouse's current practice in regard to hazardous wastes has no bearing upon what it might have done in the past.

■ The complaint sets forth two areas of misconduct by Westinghouse at its plant. One was the cleaning of grates over a storm drain (Complaint, ¶ 69); the other was the storage and eventual leakage of solvents into the ground at two locations on the plant site. (Complaint, ¶ 9, 72, 73). In connection with the latter conduct, we believe that the allegations of the complaint can fairly be read to charge Westinghouse with intentional disposal of wastes on the site (¶¶ 72–73) and, hence, the site comes within the definition of a waste disposal facility.

RCRA requires all waste disposal facilities to have a permit, *see* 42 U.S.C.

§ 6925(a), and to abide by the regulations of the EPA for the operation of a waste disposal facility. *See* 42 U.S.C. § 6924. The pertinent regulation defines a "disposal facility" as follows:

a facility or part of a facility at which hazardous waste is intentionally placed into or on the land or water, and at which hazardous waste will remain after closure.

Therefore, Westinghouse's intentional use of its plant site could result in its being subject to regulations as a disposal facility.

We reject plaintiffs' contention that an accidental discharge of wastes could subject Westinghouse to such regulation. In support of this theory, plaintiffs cite the definition of "discharge," included in the definition of "disposal," found at 40 C.F.R. § 260.10(a) as follows: "the *accidental* or intentional spilling, leaking, pumping, emitting, emptying, or dumping of hazardous waste into or on any land or water." (emphasis added) While this definition refers to an accidental placing of hazardous waste on land and water, we believe that the most pertinent definition is the one cited by defendant for "disposal facility," which clearly contemplates intentional conduct on the part of the operator. This construction of the regulations makes sense, of course, because a person could hardly be called upon to obtain a permit for property upon which he does not anticipate disposing of wastes.

■ Plaintiffs also assert that Westinghouse violated the open dumping provision of RCRA. We agree with defendant, however, that, under the Act, a claim cannot be made for violations of waste disposal facility regulations and for a violation of the open dumping prohibition. RCRA contains the following definition of "open dump":

The term "open dump" means any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste.

This definition clearly excludes hazardous waste disposal facilities from consideration as open dumps. *See also* 40 C.F.R. § 257.-1(c)(8). Because it is not clear, however, whether Westinghouse maintained a disposal facility at its plant we will leave the issue open for now and only note that the claims cannot be brought simultaneously.

■ Finally, we turn to plaintiffs' contention that the washing of grates used in the manufacturing process at the plant over a storm drain on the facility is covered by the RCRA. A review of the pertinent statutory section and regulations indicates that this type of discharge is not covered by RCRA. "Hazardous waste" is included within "solid waste." Solid waste in turn is defined to exclude "industrial discharges which are point sources subject to permits under section 1342 of Title 33 ...." 42 U.S.C. § 6903(27). Regulations promulgated pursuant to the CWA define a "point source" as, in pertinent part: "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container ... from which pollutants are or may be discharged." The drain is obviously within this definition and any disposal of industrial wastes through the drain should be dealt with under the CWA.

F. *The Existence of the Section 106 Order Does Not Bar Any of Plaintiffs' RCRA Claims.*

■ Westinghouse contends that the plaintiffs cannot maintain a private action under the RCRA because of the outstanding section 106 order, issued by the EPA under CERCLA. The following RCRA section is pertinent to the argument and deals with citizens' suits:

(a) In general

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person ... and including any past or present generator ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment ....

....

(b) Actions prohibited

....

(2)(A) ....

(B) No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—

....

(iv) has obtained a court order ... or issued an administrative order under section 106 of [CERCLA] ... pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

In the case of an administrative order referred to in clause (iv), actions under subsection (a)(1)(B) of this section are prohibited only as to the scope and duration of the administrative order referred to in clause (iv).

42 U.S.C. § 6972 (brackets added).

Westinghouse contends that the EPA and DER investigated its plant site, and four other sites used by defendant, Frederick Shealer, but the EPA ordered it to perform response actions only at two of the sites, Hunterstown Road and Shriver's Corner. It contends that the plaintiffs' attempt to force it to perform further remedial action at its plant site is an attack upon the scope of the CERCLA order in violation of § 6972(b)(2)(B)(iv). Plaintiffs contend, on the other hand, that because the order is limited to those two sites, and only to removal of contaminants from the surface of

one site and from a lagoon on the other, they are free to seek enforcement of other remedial options. In their view, they are not attacking the scope of the order since they are not seeking review of the EPA's order dealing with the drums and lagoon. Rather, their concern is directed to subsurface contamination and its affect upon their drinking water. This is outside the scope of the section 106 order and not barred by section 6972(b)(2)(B)(iv).

The dispute boils down to the meaning of "scope" within the statutory section. Does it refer solely to the response actions ordered by the Agency or does it also include actions the agency could have required on the part of the responsible party but did not? The legislative history is of assistance here. The conference committee report, representing the final statement of terms agreed to by both houses, next to the statute itself, is the most persuasive evidence of congressional intent. *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir.1985); *Monterey Coal Co. v. Federal Mine Safety and Health Review Comm'n,* 743 F.2d 589 (7th Cir.1984). The report, cited by plaintiffs, states the following in connection with this specific limitation upon citizens' suits:

> The Conferees intend that the section 7002(b)(2)(B)(iv) prohibition be limited only to the scope and duration of the court or administrative order. For example, an administrative order issued under section 106 of CERCLA or section 7003 of RCRA for surface cleanup at a site would not bar an action alleging that groundwater contamination at the site may present an imminent and substantial endangerment.

1984 U.S.Code Cong. & Ad.News 5576, 5649, 5689.

The conference committee report indicates that the plaintiffs' interpretation is the correct one. Because they are not challenging the scope of the already existing actions ordered by the EPA, and seek only to add to those actions, their citizens' suit may proceed.

## G. *Plaintiffs Have Not Set Forth a Cause of Action Under the CWA For the Storm Drain Discharge But Have Done So For the Air Shipping Tower.*

As noted previously, Westinghouse cleaned grates used in its manufacturing process by rinsing them off over a storm drain on its property. The drain led into an unnamed tributary of Rock Creek adjacent to its plant site. It also operated an air shipping tower for awhile with the temporary permission of DER. The tower drew hazardous substances out of the ground water and discharged them into the tributary. Plaintiff contends that both of these activities violated the CWA by emitting hazardous substances into the waters of the United States. Westinghouse contends that because the run off was into a storm drain, it did not have to have a permit at the time the drain was used, and that Pennsylvania's permission to operate the air stripping tower forecloses a claim for that activity.

Plaintiffs argue that the storm water run off is really process waste water, not storm water, and subject to CWA control because the cleaning of the grates is a part of the manufacturing process. We disagree. The definition of "process waste water" is as follows:

> any water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by product, or waste product.

40 C.F.R. § 117.1(j).

The water running through the storm drain does not meet this definition because it did not come into direct contact with any raw material, etc., during the manufacturing process. That process was completed before the grates were cleaned. Since a permit was not required for storm water point sources until at least April 26, 1985, 49 Fed.Reg. 37,998 (1984), and under proposed regulations not until December 31, 1985, 50 Fed.Reg. 9362 (1985), defendant could not have violated CWA provisions in connection

with any contaminated storm water run off.

■ We do, however, conclude that a violation can be found in connection with the air stripping tower. While we can find no authority for its conduct, DER notified Westinghouse by letter that it could for a temporary period operate the tower with certain effluent limitations. Assuming that this letter could have constituted a valid NPDES permit,[3] Westinghouse apparently violated the terms of the "permit" in discharging contaminated water. DER refused to extend permission any further when water samples apparently revealed violations of its original letter permit. Resolution of this issue can await a further record because on the documents before us, we cannot decide what, in fact, was the applicable standard Westinghouse had to meet in operating the air stripping tower.

### H. *Group IV Plaintiffs Have Standing to Assert RCRA and CWA Claims.*

■ Group IV plaintiffs are "residential property owners who do not presently have hazardous substances from the Hunterstown Road site contaminating their wells, but are within the zone of impact as defined by EPA ...." (Complaint, ¶ 291). Defendant asserts that they lack standing because they could not have suffered an injury in fact without actual contamination of their property. We recently considered the standing issue in *Harrisburg Hospital v. Thornburgh,* 616 F.Supp. 699 (M.D.Pa. 1985). There, we quoted from *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595, 610 (1978) as follows:

> The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 7 L.Ed.2d 663,

82 S.Ct. 691 [703] (1972). As refined by subsequent reformulation this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555 [561], 50 L.Ed.2d 450 (1977).

*Harrisburg Hospital, supra,* at 702.

Additionally, the injury may be a threatened one. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

We have no doubt that the Group IV plaintiffs meet the above criteria. They do not simply have an "interest" in the problem as was the situation in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), cited by defendant. Rather, their claimed injury is a personal one since they adjoin land and water that have already been contaminated, and they seek to prevent the threatened spread of the pollution to their own land. They clearly have standing.

### I. *Plaintiffs May Seek Civil Penalties For Past Violations of the CWA.*

■ Westinghouse asserts that civil penalties can only be sought in a citizens' suit for a violation of the CWA occurring at the time of the filing of the complaint. The citizens' suit provision of the CWA, provides in relevant part, as follows:

> (a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
>
> (i) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this subchapter or (b) an order issued by the Administrator or a State with

---

**3.** An "NPDES permit" refers to the National Pollutant Discharge Elimination System and permits issued pursuant to CWA. The DER is authorized to issue such permits.

respect to such a standard or limitation
....

33 U.S.C. § 1365(a).

Because Westinghouse could not be alleged "to be in violation" at the time of filing of the complaint, Westinghouse contends that it cannot now be found liable for past violations of the Act, citing *Hamker v. Diamond Shamrock Chemical Co.*, 765 F.2d 392 (5th Cir.1985). Plaintiffs cite a number of cases which have reached the opposite conclusion. *See, e.g., Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F.Supp. 1474 (D.N.J. 1985); *Chesapeake Bay Foundation v. Gwaltney of Smithfield Ltd.*, 22 Env't. Rep.Cas. (BNA) 2121 (E.D.Va.1985); *Sierra Club v. Raytheon Co.*, 22 Env't.Rep. Cas. (BNA) 1050 (D.Mass.1984).

We have carefully reviewed the cases cited by both sides. We agree with those courts which have permitted civil penalties for past violations. The court in *Student Public Interest Research Group* stated it succinctly as follows:

> The defendant argues that "in violation" clearly refers to violations in the present, that is, occurring no earlier than the date of suit. The court does not believe that "in violation" necessarily confines violations to those presently or prospectively occurring.

> A plausible construction of the language is that one is "in violation" and continues to be "in violation" by having "violated." In any event, however, the next paragraph of § 1365(a) quite specifically refers to the court's power to impose civil penalties in citizens' suits and contains no limiting time frame. This would seem to defeat defendant's argument.

600 F.Supp. at 1476.

J. *Disposition of Plaintiffs' Motion.*

In accordance with the foregoing discussion, we will dispose of plaintiffs' motion as follows. Initially, we note that doing so has been made more difficult because plaintiffs have failed to set forth a specific request for relief, seeking only partial summary judgment generally. Havener's affidavit concerns only the Westinghouse plant site. Based upon the references contained in the affidavit,[4] and defendant's failure to contest the accuracy of the supporting documents, plaintiffs have established that hazardous substances were stored and eventually released into the soil and water at the Westinghouse plant site (Havener affidavit, ¶¶ 3, 5, 9 and 11). Consequently, defendant Westinghouse is liable to neighbors at the site for response costs. Such response costs can be determined in a later, appropriate proceeding.

We will issue an appropriate order.

## ORDER

AND NOW, this 1st day of October, 1985, it is ordered that:

1. Plaintiffs' motion for partial summary judgment is granted as to their first cause of action. In all other respects, the motion is denied.

2. Judgment is hereby entered for plaintiffs on their first cause of action against defendant, Westinghouse Electric Corporation.

3. Defendant, Westinghouse Electric Corporation's, motion for summary judgment is hereby denied.

4. A scheduling conference will be held with counsel in my chambers on Wednesday, October 9, 1985 at 11:00 a.m. for the purpose of scheduling discovery, joinder of parties, the filing of motions, etc. With the agreement of counsel this conference may be held by telephone conference call, to be arranged and placed by counsel as they may agree (782–3701).

---

**4.** References to paragraph numbers of the affidavit shall be for convenience and actually shall refer to the document numbers of the plaintiffs' appendix referred to in the affidavits.